DA 11-0241

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 86

JOEL ST. GERMAIN,

        Petitioner and Appellant,

   v.

STATE OF MONTANA,

        Respondent and Appellee.

| | |
|---|---|
| APPEAL FROM: | District Court of the Twenty-First Judicial District, In and For the County of Ravalli, Cause No. DV 08-185 Honorable Jeffrey H. Langton, Presiding Judge |

COUNSEL OF RECORD:

        For Appellant:

           Chad Wright, Hooks & Wright, Helena, Montana

        For Appellee:

           Steve Bullock, Montana Attorney General; Tammy K Plubell, Assistant Attorney General, Helena, Montana

           William Fulbright, Ravalli County Attorney, Hamilton, Montana

        Submitted on Briefs:  February 15, 2012

                Decided:  April 17, 2012

Filed:

                  _____

                          Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1 Joel St. Germain (St. Germain) appeals the dismissal of his petition for postconviction relief by the Twenty-First Judicial District Court, Ravalli County. We affirm.

## BACKGROUND

¶2 On June 4, 2004, a jury unanimously found St. Germain guilty of four counts of incest and four counts of sexual intercourse without consent for sexually abusing H.M., his stepdaughter, repeatedly between the ages of 11 and 19. St. Germain first appealed his conviction in 2004 and raised three issues: (1) his constitutional right to be present at all critical stages of his trial had been violated, (2) the district court erred in ruling that defense investigator Ron Maki could not testify about H.M.'s credibility, and (3) Kelli Sather, St. Germain's defense counsel at trial, provided ineffective assistance of counsel. *State v. St. Germain*, 2007 MT 28, ¶¶ 2-5, 336 Mont. 17, 153 P.3d 591. This Court affirmed St. Germain's conviction on the first two issues and held that his ineffective assistance of counsel claims were non-record based and would be better addressed at a postconviction relief proceeding. *St. Germain*, ¶¶ 24, 31, 43.

¶3 St. Germain then filed a petition for postconviction relief with the District Court in 2008 setting forth nine claims of ineffective assistance of counsel against Sather, and one claim against David Stenerson, his original appellate counsel. An evidentiary hearing was held on April 2, 2009. On March 17, 2011, the District Court found that St. Germain received effective assistance of counsel, and dismissed his petition for postconviction relief. It is from this order that St. Germain appeals. The facts are set forth in detail in *St. Germain*,

and will be discussed here only as they pertain to his claims for relief. We will discuss the facts of each claim separately below.

¶4 We restate the issues on appeal as follows:

¶5 *Issue One: Did the District Court err when it denied St. Germain postconviction relief based on his claims of ineffective assistance of trial counsel?*

¶6 *Issue Two: Did the District Court err when it denied St. Germain postconviction relief based on his claim of ineffective assistance of appellate counsel?*

## STANDARD OF REVIEW

¶7 Claims of ineffective assistance of counsel are mixed questions of law and fact which this Court reviews de novo. *State v. Miner*, 2012 MT 20, ¶ 10, 364 Mont. 1, 271 P.3d 56. We review claims of ineffective assistance of appellate counsel like those of trial counsel. *Rogers v. State*, 2011 MT 105, ¶ 37, 360 Mont. 334, 253 P.3d 889.

## DISCUSSION

¶8 The Sixth and Fourteenth Amendments to the United States Constitution, and Article II, Section 24 of the Montana Constitution, guarantee individuals the right to counsel in criminal prosecutions. To determine if an individual has received ineffective assistance of counsel, we use the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). *Miner*, ¶ 11. Under this test, the defendant must demonstrate (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defendant. *Miner*, ¶ 11. Claims of ineffective assistance of counsel must be

3

grounded on facts in the record and not on mere conclusory allegations. *State v. Finley*, 2002 MT 288, ¶ 9, 312 Mont. 493, 59 P.3d 1132.

¶9 In order to prevail on an ineffective assistance of counsel claim, the defendant must satisfy both prongs of the *Strickland* test. *Whitlow*, 2008 MT 140, ¶ 11, 343 Mont. 90, 183 P.3d 861. We may address the prongs in any order, and, if the defendant makes an insufficient showing regarding one prong, the other need not be addressed. *Miner*, ¶ 11.

¶10 In evaluating whether counsel's performance was deficient under the first prong of *Strickland*, we must determine whether counsel's representation fell below an objective standard of reasonableness considering prevailing professional norms and all the circumstances. *Whitlow*, ¶ 14. We " 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *Whitlow*, ¶ 15 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). To overcome this presumption, the defendant must " 'identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.' " *Whitlow*, ¶ 16 (quoting *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066). We then " 'must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *Whitlow*, ¶ 16 (quoting *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066). In our analysis, we will make every effort " 'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from the counsel's perspective at the time.' " *Whitlow*, ¶ 15 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065).

4

¶11 The focus of our analysis under the second prong of *Strickland* – whether the defendant was prejudiced by counsel's deficient performance – focuses on whether counsel's deficient performance renders the trial result unreliable or the proceedings fundamentally unfair. *Miner*, ¶ 12. To establish prejudice, the defendant must show that, but for counsel's errors, a reasonable probability exists that the result of the proceeding would have been different. *Miner*, ¶ 12. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings. *Miner*, ¶ 12.

¶12 *Issue One: Did the District Court err when it denied St. Germain postconviction relief based on his claims of ineffective assistance of trial counsel?*

¶13 St. Germain raises four instances where he believes Sather provided ineffective assistance of counsel at trial: (1) when Sather provided the defense investigator's notes to the State, (2) when Sather failed to retain a medical expert to rebut the State's medical expert, (3) when Sather failed to anticipate and object to the State's introduction of "other bad acts," and (4) when Sather did not request a *Mazurek* hearing. We will separately address each of St. Germain's claims.

### 1. Investigator's Notes

¶14 St. Germain first alleges that Sather was ineffective because she turned over the defense investigator's notes to the prosecution. Prior to trial, Sather procured funds from the District Court to hire an investigator, Ron Maki, to gather information. Maki interviewed numerous witnesses and prepared written notes from the witnesses' statements. After

5

obtaining Maki's notes, Sather provided them to the State anticipating that Maki would be called as a witness.

¶15 At trial, the State used Maki's notes during its questioning of witnesses Ron Hale, William Drews, Dorothy Drews, Robert Gillespie and Cheryl Gillespie. The District Court, applying *Strickland*, found Sather's performance was deficient, but that St. Germain was not prejudiced by Sather's actions in light of the overwhelming evidence against him. In its analysis, the District Court only considered the testimony of Hale.

¶16 On appeal, St. Germain argues he was prejudiced because the State was more effective in using the notes than Sather, and the evaluation of prejudice cannot be limited to the State's questioning of Hale, but must include the State's questioning of William, Dorothy, Robert, and Cheryl.

¶17 We agree with the District Court that St. Germain was not prejudiced by Sather providing Maki's investigative notes to the State. Initially, St. Germain claimed he was prejudiced when the State used Maki's notes to call Hale as a prosecution witness. Hale's testimony, however, was not particularly damaging to St. Germain. Hale worked with St. Germain and H.M. installing carpet for about eight months, and during that time, Hale observed the pride St. Germain had in his children and St. Germain's hope that they would excel. In his testimony, Hale stated that St. Germain praised H.M. almost daily for her hard work. In addition, Hale described St. Germain's work van – where St. Germain was alleged to have regularly sexually assaulted H.M. – as being full of carpeting tools and supplies, thus

6

making it unlikely there was any room for repeated sexual encounters between St. Germain and H.M.

¶18    In contrast, Hale's damaging testimony included statements that St. Germain had "maybe a little bit" of a temper, was maybe a little controlling, and that Hale's wife was suspicious about St. Germain's relationship with H.M.   This limited testimony had a negligible impact given that other witnesses testified in much greater detail about St. Germain's temper and their suspicions about St. Germain's relationship with H.M.  Overall, Hale's testimony was more favorable than not to St. Germain.

¶19    As with Hale, St. Germain argues that the State's use of Maki's investigative notes resulted in prejudice when the State used them to question William and Dorothy Drews. According to St. Germain, the Drews were important to counter H.M.'s claims that she was sexually abused at home and at work in Butte.  Yet, the Drews' testimony reveals little. William Drews testified on cross-examination that St. Germain's work van was full in the morning, and was emptier at night; that H.M. was punished by St. Germain; and that he heard St. Germain arguing with Colleen, St. Germain's wife at the time, about sex.  Dorothy Drews testified on cross-examination that she recalled H.M. working with St. Germain, that she remembered St. Germain punishing H.M. by making her hold weights for longperiods of time, and that she did not remember Colleen and St. Germain arguing about sex.  At best, this testimony demonstrates St. Germain punished H.M. with weights and may have argued with Colleen about sex.  St. Germain can point to no specific prejudice resulting from this testimony.

¶20    Similarly, the State's use of Maki's investigative notes to question the Gillespies did not prejudice St. Germain.  St. Germain argues that the Gillespies were important to the defense to show that H.M. frequently stood up for herself against St. Germain.  Robert testified that H.M. would regularly tell St. Germain to knock it off, and that H.M. and St. Germain were the best of buds and always together.  Cheryl corroborated Robert's testimony that H.M. told St. Germain to knock it off when he was harassing her.  From the Gillespies' testimony, it is apparent that they believed St. Germain was a great father, and that Colleen was a cold parent who was self-centered.  St. Germain complains that he was prejudiced, but the State's use of the notes only bolstered his defense.

¶21    On balance, the testimony of Hale, the Drews, and the Gillespies in its entirety, was favorable to St. Germain.  Accordingly, St. Germain has not demonstrated prejudice sufficient to undermine confidence in the outcome of his trial as a result of Sather turning over Maki's notes to the State and we find no ineffectiveness on this issue.

### 2. Medical Expert

¶22    St. Germain next argues that Sather's performance was deficient because she did not consult an expert witness to rebut the testimony of the State's expert.  In August 2003, H.M. was examined at First STEP, a child advocacy center associated with St. Patrick's Hospital in Missoula, Montana, for sexual abuse.  The practitioner used a colposcope and the colposcope examination was preserved on video.  The program's medical director, Dr. Karen Mielke, reviewed the entire record of H.M.'s examination, including the video, and attached an addendum to the record to clarify the significance of the findings.

8

¶23   At trial, Dr. Mielke was called by the State as a medical expert in the area of child sexual abuse.  Dr. Mielke testified that H.M.'s physical examination revealed a scar representing a complete tear of the hymen which had healed.  This scarring could have occurred any time prior to the two weeks before trial and could have been the result of prepubescent penetration or forced penetration at any age.  H.M.'s anal examination was normal.

¶24   Dr. Mielke further explained that a prepubescent girl would recoil from the slightest touch to her hymen because of its increased sensitivity, but at puberty, the hymen becomes more elastic allowing for easier penetration.  Eventually, a woman's estrogen production stops and the hymen tissue shrinks, but some hymen tissue always remains.

¶25   In Dr. Mielke's opinion, H.M.'s hymenal scarring was consistent with H.M.'s reported testimony of St. Germain's attempts to penetrate her vaginally between the ages of 11 and 14, and H.M.'s description of complete penetration at age 14.  Similarly, H.M.'s anal examination, though normal, was not inconsistent with chronic anal sexual abuse.

¶26   Instead of calling an expert witness to contradict Dr. Mielke, Sather developed a theme that Dr. Mielke, as an advocate for sexual abuse victims, was biased and that the scar on H.M.'s hymen could have resulted from consensual intercourse that occurred at any time up to two weeks before H.M.'s physical examination at First STEP.  During her closing argument, Sather emphasized this aspect of Dr. Mielke's testimony.

¶27   Sather utilized this strategy because she consulted the nurse practitioner who performed H.M.'s physical examination, and she decided she did not need an expert because

9

the results of the examination were fairly insignificant. At the evidentiary hearing, Sather maintained she would have found a defense expert witness had Dr. Mielke insisted that the scar on H.M.'s hymen was a result of forced sexual intercourse and another doctor could say that it resulted from consensual intercourse.

¶28 To challenge Sather's decision, St. Germain retained Dr. Bennett, a board-certified pathologist, to review Dr. Mielke's trial testimony and findings regarding H.M. Dr. Bennett disagreed with Dr. Mielke's testimony in several regards. First, he disagreed with her testimony that a young girl's hymen is sensitive to the touch, but acknowledged that young girls may withdraw from touch as a result of anxiety rather than pain. Second, Dr. Bennett testified that St. Germain had venereal warts – which are infectious and contagious – but H.M. did not. Dr. Bennett elaborated that one cannot, however, base an opinion on whether H.M. was sexually abused on the presence or absence of venereal warts. Third, Dr. Bennett stated that had St. Germain repeatedly penetrated H.M. anally, it would have resulted in the vaginalization of the anus. Nonetheless, Dr. Bennett agreed with Dr. Mielke that most anal examinations are normal even after chronic anal sexual abuse. Last, Dr. Bennett concluded that after repeated vaginal penetration, the hymen goes away for all time. He opined that the scarring on H.M.'s hymen could have resulted from an injury during prepubertal intercourse or postpubertal intercourse, during forced intercourse or consensual sexual intercourse.

¶29 After the evidentiary hearing, the District Court concluded that St. Germain did not meet his burden under *Strickland* because Sather's performance was not deficient. According to the District Court, Sather's cross-examination of Dr. Mielke was successful in

highlighting the inconclusiveness of the physical evidence. The court further noted Dr. Bennett's testimony did not contradict Dr. Mielke's trial testimony, but rather supported her conclusion that the examination of H.M. was not dispositive of sexual abuse.

¶30 On appeal, St. Germain argues that Sather's performance was deficient when she failed to retain or consult a medical expert to contradict the testimony of Dr. Meilke. To support this proposition, St. Germain relies on *Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005). In *Gersten*, the defendant was convicted for sexually assaulting his daughter. At trial, the prosecution presented expert medical testimony supporting the alleged victim's testimony that she had been subject to vaginal and anal penetration. *Gersten*, 426 F.3d at 595. The prosecution offered no objective evidence to support an inference that any crime took place at all, and presented no physical evidence linking Gersten to any crime that occurred. *Gersten*, 426 F.3d at 613. Instead of consulting an expert witness, defense counsel relied on cross-examination to establish that it was unclear when the damage to the hymen and rectum occurred. *Gersten*, 426 F.3d at 595. Post trial, the defendant obtained an affidavit from a qualified medical examiner who stated that the physical findings did not corroborate the alleged victim's account of years of repeated sexual abuse. *Gersten*, 426 F.3d at 607.

¶31 The Second Circuit on appeal noted that defense counsel's failure to call a witness was essentially a concession "that the physical evidence was indicative of sexual penetration[.]" *Gersten*, 426 F.3d at 608. Continuing, the court determined that had counsel conducted an investigation into possible medical experts she "would likely have discovered

11

that exceptionally qualified medical experts could be found who would testify that the prosecution's physical evidence was not indicative of sexual penetration and provided no corroboration whatsoever of the alleged victim's story." *Gersten*, 426 F.3d at 608.

¶32    St. Germain's reliance on *Gersten* is unpersuasive due to the fact that St. Germain's expert, Dr. Bennett, did not contradict Dr. Mielke's testimony as the expert did in *Gersten*. Drs. Mielke and Bennett in fact agreed upon a number of significant details such as the scar on H.M.'s hymen resulted from penetration; there was no way to date the injury other than it had to have occurred two weeks or more prior to H.M.'s physical examination; there was no physical sign of anal penetration; and H.M.'s lack of genital warts neither proved nor disproved sexual abuse. Given that Drs. Mielke and Bennett agreed on the inconclusive results of the physical examination, St. Germain has not established that had Sather sought an "exceptionally qualified medical expert," she would have been able to find one. *Gersten*, 426 F.3d at 608.[1]

¶33    In contrast to *Gersten*, the United States Supreme Court found that it was reasonable for the California Supreme Court to deny a defendant's claim of ineffective assistance of counsel when defense counsel failed to consult an expert witness. *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770 (2011). In *Harrington*, during Richter's murder trial, the prosecution presented testimony from a blood pattern expert and a serologist. On cross-examination, defense counsel elicited concessions from the prosecution's experts undermining their

---

[1]  Sather's defense was also much more comprehensive than that in *Gersten*, where the prosecutor only called five witnesses, and the defense presented no witnesses. Sather countered the State's 18 witnesses with 12 of her own.

12

opinions. Defense counsel then called seven witnesses, including Richter, but did not call an expert witness. *Harrington*, 131 S. Ct. at 781-82.

¶34    After being convicted, Richter petitioned the California Supreme Court for a writ of habeas corpus and filed affidavits from three forensics experts – a serologist, a pathologist and an expert in blood stain analysis – all bolstering Richter's defense theory. The California Supreme Court summarily denied him relief. Richter then sought habeas relief through the federal courts, with his claim eventually being denied by the Supreme Court. *Harrington*, 131 S. Ct. at 783.

¶35    At issue before the Supreme Court was whether the California Supreme Court's summary denial of Richter's *Strickland* claims was reasonable. *Harrington*, 131 S. Ct. at 783. The Supreme Court determined that it was reasonable to conclude defense counsel's performance was not deficient because an attorney could reasonably decide to forego an inquiry into the blood evidence. *Harrington*, 131 S. Ct. at 788. There were any number of experts Richter's defense counsel could have called, but the Court noted, an attorney can avoid activities that appear distractive from more important duties, *Harrington*, 131 S. Ct. at 789 (citing *Bobby v. Van Hook*, __ U.S. __, 130 S. Ct. 13, 19 (2009)), and even if expert testimony is helpful, a competent attorney reasonably may elect not to use it, *Harrington*, 131 S. Ct. at 779.

¶36    The Supreme Court additionally concluded it was reasonable to find that Richter was not prejudiced by his counsel's strategy. *Harrington*, 131 S. Ct. at 792. Richter's expert testimony was inconclusive and did not undermine the State's experts to a greater extent than

13

his counsel did through cross-examination, when defense counsel extracted a concession from the State's expert that was similar to evidence presented by Richter's serologist. *Harrington*, 131 S. Ct. at 791. In light of defense counsel's skillful cross-examination and the sufficiency of the circumstantial evidence, the Supreme Court determined it was reasonable to conclude that Richter was not prejudiced by his counsel's failure to consult an expert. *Harrington,* 131 S. Ct. at 792.

¶37    We agree with the United States Supreme Court that "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 131 S. Ct. at 791. Defense counsel's failure to consult an expert witness is not per se unreasonable. An attorney may forego the use of an expert if the investigation would be fruitless or might be harmful to the defense. *Harrington*, 131 S. Ct. at 789-90 (citing *Strickland*, 466 at 691, 104 S. Ct. at 2066). In some cases, however, counsel may be ineffective for failing to consult an expert. *Harrington*, 131 S. Ct. at 789.

¶38    In the present case, St. Germain has not established that Sather's performance was deficient or that he suffered any prejudice as a result of Sather's performance. Sather's initial strategy was to exclude Dr. Mielke from testifying, and if that failed, her fallback plan was to conduct a thorough cross-examination. Sather based her decision on her consultation with the nurse practitioner that examined H.M. and Dr. Mielke's report indicating a lack of physical evidence. Sather furthermore conducted a skillful cross-examination of Dr. Mielke. At trial, Sather elicited a concession from Dr. Mielke – supported by Dr. Bennett's findings –

14

that the physical evidence was consistent with both sexual abuse *and* consensual sexual intercourse. Sather highlighted this aspect of Dr. Mielke's testimony during her closing argument.

¶39 Considering Sather's performance and Dr. Bennett's testimony, Sather's decision not to consult an expert was reasonable in light of all of the circumstances. St. Germain moreover has not shown that any further investigation would have likely produced a different result at trial. Accordingly, Sather's assistance was not ineffective on this issue.

### 3. Other Bad Acts

¶40 St. Germain next argues that Sather provided ineffective assistance of counsel when she failed to anticipate and object to the State's introduction of "other bad acts," and when she introduced other bad acts evidence on her own. In his Petition, St. Germain originally argued that Sather provided ineffective assistance of counsel because she failed to object to evidence of St. Germain's (1) physical contact with H.M. outside the jurisdiction where he was charged; (2) abuse of his son, D.S.G.; (3) intimidation of members of the community; (4) providing marijuana to and using marijuana with H.M. and L.R.;[2] and (5) improper sexual contact with L.R. Notably, St. Germain is not appealing the District Court's finding that Sather's failure to object to evidence of St. Germain's physical contact with H.M. outside the jurisdiction where he was charged did not amount to ineffective assistance of counsel.

---

[2] L.R. and H.M. were friends, and when L.R.'s parents moved away from Darby before L.R.'s senior year of high school, St. Germain allowed L.R. to live with him, H.M. and D.S.G. for her senior year. L.R. and H.M. ran away from St. Germain's house the week before L.R.'s graduation from Darby High School.

¶41    As to testimony regarding St. Germain's abuse of D.S.G., D.S.G. testified that his father disciplined him on occasion by hitting him with a wooden paddle, and when his mother was absent, karate punching him and kicking him in the stomach, sometimes severely enough to knock the wind out of him.  On cross-examination, D.S.G. testified that St. Germain had used a whip on him, H.M. and L.R.  This testimony surprised Sather because St. Germain failed to fully inform her of his actions.  However, Sather was able to elicit testimony from D.S.G. that he did not remember how big the whip was and that he had never told anyone about being whipped until that day.

¶42    Concerning intimidation of community members, Dan Johnston and Jason Yorton testified about having been intimidated by St. Germain.  Johnston, the Darby High School principal, testified that St. Germain came to school to see him because the previous day H.M. and D.S.G. arrived home ten minutes late after the bus driver had stopped the bus to address discipline problems.  During his visit with Johnston, St. Germain angrily demanded the bus problem be solved because he needed H.M. home immediately after school for work.  Johnston further testified that St. Germain informed him he had a black belt in karate and indicated he was holding himself back, but was capable of getting angrier.  Johnston felt threatened by St. Germain to the point of asking his secretary to keep an eye on things if St. Germain returned.

¶43    Yorton, who similarly felt intimidated by St. Germain, originally met St. Germain while Yorton was an employee of Abbey Carpet in Hamilton.  St. Germain and H.M. regularly came into the store to pick up product to install.  During their encounters, H.M. and

16

Yorton became attracted to each other, but because Yorton felt intimidated by St. Germain – who always had the look of a jealous boyfriend – he never asked H.M. out for a date. St. Germain, at times, spontaneously demonstrated his karate to Yorton to make sure Yorton was aware St. Germain could subdue him. On one occasion, St. Germain approached Yorton from behind at his place of work and put him in a choke hold; Yorton felt scared and threatened. Yorton and H.M. began meeting secretly, but their visits never lasted long because Yorton felt he was risking death if St. Germain ever found out.

¶44 K.F., a friend of L.R. and H.M., also testified about St. Germain's intimidating nature. He recalled that L.R. had bruises on her arm, and that L.R.'s demeanor changed when she moved in with St. Germain. Before L.R. lived with St. Germain, K.F. remembered her being happy, but upon moving in with St. Germain, K.F. described L.R. as being tired, never being happy, and not liking to go home.

¶45 Regarding marijuana usage, on direct examination, L.R. testified that on the night she and H.M. planned to run away, St. Germain asked them to smoke marijuana with him. At that point, Sather objected to evidence of marijuana use on the basis of Rule 404(b), M. R. Evid., but the District Court overruled her objection. L.R. then testified that St. Germain provided marijuana and smoked it with both her and H.M. After L.R. and H.M. smoked marijuana with St. Germain, he would not let them go out of the house or drive. Sather also elicited testimony from Yorton that he would go to St. Germain's house to pick up marijuana from St. Germain.

17

¶46   In regards to St. Germain's inappropriate touching of L.R., Sather initially asked if L.R. ever had feelings for St. Germain as more than a friend. L.R. responded that she did for a while. Sather then asked if St. Germain had ever touched her inappropriately, and L.R. responded that he had once touched her breasts. L.R. had not disclosed this information to investigators despite numerous opportunities to do so, and St. Germain had not told Sather of this incident.

¶47   The District Court determined that Sather's performance was not deficient in relation to this evidence because the totality of the evidence was admissible under the transaction rule (§ 26-1-103, MCA).

¶48   On appeal, St. Germain argues that recent changes in our interpretation of Rule 404(b), M. R. Evid., and the transaction rule require us to find Sather's performance was deficient. St. Germain cites to our language in *State v. Guill*, 2010 MT 69, ¶ 26, 355 Mont. 490, 228 P.3d 1152, where we stated that we have "endeavored to cabin the application of the transaction rule to prevent it from overthrowing the Rule 404(b) exclusion of other-bad-acts evidence." St. Germain also points us to *State v. Dist. Ct. of the Eighteenth Jud. Dist.*, 2010 MT 263, ¶ 3, 358 Mont. 325, 246 P.3d 415, where we overruled *State v. Just*, 184 Mont. 262, 602 P.2d 957 (1979), and *State v. Matt*, 249 Mont. 136, 142, 814 P.2d 52, 56 (1991), and restated the procedural requirements for the introduction of other bad acts. *Guill* and *Dist. Ct. of the Eighteenth Jud. Dist.* were not the law at the time of St. Germain's trial, and we will not retroactively apply them to evaluate Sather's performance. We, therefore,

18

will not find Sather's performance deficient pursuant to either *Guill* or *Dist. Ct. of the Eighteenth Jud. Dist.*

¶49 Notwithstanding St. Germain's alleged errors, we find that Sather provided effective assistance of counsel. In regards to testimony from Johnston and Yorton, Sather attempted to exclude their testimony through a motion in limine, which the District Court denied. Sather similarly tried to exclude evidence of marijuana use by objecting at the first opportunity, but her objection was overruled by the court. Sather also attempted to impeach K.F.'s testimony by calling two additional witnesses, but again, the Court denied her request.

¶50 In addition, any deficiency in Sather's performance related to her questioning of D.S.G. and L.R. or related to D.S.G.'s abuse is a result of St. Germain failing to fully inform her of his actions. St. Germain cannot fail to warn Sather of his behavior and then later complain that her questions inadvertently led witnesses to discuss such behavior. "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066.

¶51 Accordingly, we agree with the District Court that Sather provided effective assistance by acting reasonably in regards to evidence of St. Germain's abuse of D.S.G., his intimidation of community members, his distribution and use of marijuana, and his inappropriate sexual contact with L.R.

### 4. *Mazurek* Hearing

¶52    St. Germain next argues Sather provided ineffective assistance when she failed to request a hearing, pursuant to *State ex rel. Mazurek v. Dist. Ct. of the Mont. Fourth Jud. Dist.*, 277 Mont. 349, 922 P.2d 474 (1996), to attempt to introduce evidence of an alleged false allegation of sexual abuse that H.M. made against her biological father. H.M.'s alleged prior false allegation stems from a letter authored by Sarah Baxter, a clinical psychologist, in 1993. The purpose of Baxter's letter was to make recommendations to help H.M. adjust to living between two families after her biological father and mother separated. The letter provides in pertinent part:

> [H.M.] had also reported to a nurse at Western Montana Clinic that her [biological] father *might have molested her in her sleep*. After interviewing [H.M.] very carefully on this subject, I do not believe that she was sexually abused by her [biological] father. I do believe that [H.M.] has some other concerns about her relationship with her [biological] father and she has been able to begin address these concerns by bringing up her worry about sexual abuse.

(Emphasis added.)

¶53    During the final pretrial conference the State made a motion to exclude testimony regarding whether H.M. had previously accused her biological father of molesting her. Sather, after having researched the admissibility of prior false allegations, agreed that the prior allegation was not admissible at trial and did not request a pretrial hearing to determine its admissibility. Sather was also concerned that the jury could conclude St. Germain instigated the whole notion of sexual abuse between H.M. and her biological father.

¶54    Montana's Rape Shield law, § 45-5-511, MCA, mandates the exclusion of evidence of a complainant's sexual conduct, subject to narrowly drawn exceptions which must satisfy a

20

preliminary determination of admissibility. "This statutory prohibition reflects a compelling interest in favor of 'preserv[ing] the integrity of the trial and . . . prevent[ing] it from becoming a trial of the victim.' " *State v. Anderson*, 211 Mont. 272, 283, 686 P.2d 193, 199 (1984) (quoting *State v. Higley*, 190 Mont. 412, 424, 621 P.2d 1043, 1050-51 (1980)). The bar imposed by this statute, however, is not absolute when it concerns the complainant's prior false allegations. *Anderson*, 211 Mont. at 284, 686 P.2d at 200.

¶55 A defendant cannot overcome the protections afforded a victim under the rape shield statute with speculative or unsupported allegations. *See State v. Ahto*, 1998 MT 200, ¶ 17, 290 Mont. 338, 965 P.2d 240. This Court established the requirements for introducing prior false allegations in *Mazurek*, 277 Mont. at 358, 922 P.2d at 480 (citing *Miller v. State*, 779 P.2d 87, 90 (Nev. 1989)), wherein this Court held that the defendant must establish at a pretrial hearing: (1) an accusation was in fact made; (2) the accusation was in fact false; and (3) the evidence is more probative than prejudicial.

¶56 The District Court concluded that Sather's performance was not deficient when she failed to request a *Mazurek* hearing. In its order, the District Court determined that Dr. Baxter's letter was insufficient to meet the first element of *Mazurek*, and furthermore, St. Germain's role as the party who initially reported this allegation gives rise to concern that this allegation was part of St. Germain's ultimate plan to isolate, manipulate, and control H.M. for his sexual gratification.

¶57 On appeal, St. Germain argues that Dr. Baxter's letter is admissible as a prior false allegation against H.M.'s biological father. A close reading of Dr. Baxter's letter, however,

demonstrates that H.M. reported her father "*might* have molested her in her sleep," not that he in fact did molest her. St. Germain has failed to provide independent competent evidence showing that H.M. actually made a sexual allegation against her father. Accordingly, any attempt by Sather to present evidence of the false allegation to the jury would have been futile because Sather could not have established the first element required under *Mazurek*. Therefore, Sather's decision not to request a *Mazurek* hearing was reasonable and St. Germain received effective assistance of counsel on this issue.

¶58 ***Issue Two: Did the District Court err when it denied St. Germain postconviction relief based on his claim of ineffective assistance of appellate counsel?***

¶59 St. Germain alleges that his initial appellate counsel, Stenerson, denied him effective representation on appeal because he did not challenge the District Court's failure to remove juror Charlton for cause. During voir dire, the following exchange took place between juror Charlton and the prosecutor, William Fulbright:

> Mr. Fulbright: You say [sexual abuse] upsets you. That's – I guess the subject matter you find upsetting. Is that –
>
> Prospective Juror Charlton: The individuals that do it upsets [sic] me.
>
> Mr. Fulbright: Okay. What you're going to see as this case progresses is the state has accused, I guess is the right word, by charging, the defendant with those crimes. Okay?
>
> Prospective Juror Charlton: I understand that.
>
> Mr. Fulbright: At the same time – we'll talk more about this – the defendant has a right to a fair trial. Right?
>
> Prospective Juror Charlton: Right.

Mr. Fulbright: I understand you find that upsetting. Would that influence your ability to look at the evidence and weigh the evidence and be able to discuss it in the jury room and come to some conclusion in your mind, absent – you know, before you get to the part about it upsets you, but come to some conclusion about whether the defendant did or did not commit the crimes?

Prospective Juror Charlton: I think I would try to be objective, but if they're guilty – It is something I can't stand.

. . .

Mr. Fulbright: . . . Somebody is accused, and we haven't decided whether they're guilty or not. The jury hasn't. Do you think you could set those feelings aside and remain objective about, this witness says this, this witness says that, and this witness says that, and not let those feelings color your working on whether there is or is not guilt?

Prospective Juror Charlton: I think I could.

Mr. Fulbright: You would be comfortable sitting as a juror in this type of case and making that decision?

Prospective Juror Charlton: I believe I could.

¶60 During Sather's questioning, the following exchange occurred with juror Charlton:

Ms. Sather: . . . do you feel like you could honestly sit here throughout that trial and remain impartial and go into that jury room and make a decision based only on the evidence you heard and not any feelings you have?

Prospective Juror Charlton: I think I could. I try to be fair, but I do have strong beliefs.

. . .

Ms. Sather: Okay, So does it bother you to the extent that – Would you be sitting there thinking other thoughts that didn't really relate to the evidence during trial?

Prospective Juror Charlton: I don't think I would be thinking of the thoughts. I think I would be thinking what's going on in the trial but –

.   .   .

Ms. Sather: . . . So what we need to determine is if your feelings, if any sympathy you may have for any witnesses that may testify, could sway you based on those feelings. Does that make sense?

Prospective Juror Charlton: It makes sense. I can imagine if a young lady was violated I would probably listen to her quite a bit, lean towards her.

.   .   .

Ms. Sather: So you think you might give the alleged victim in this case more weight? You would really listen to her more than other witnesses?

Prospective Juror Charlton: I would try to be fair, but I definitely would listen to her.

¶61   At that point, Sather challenged juror Charlton for cause and the following dialogue occurred between the District Court and juror Charlton:

The Court: Sir, let me ask you a few questions. You do acknowledge that the defendant at this point is just accused of certain offenses?

Prospective Juror Charlton: Right.

The Court: And he is presumed innocent?

Prospective Juror Charlton: Yes, Sir.

The Court: You're prepared to give him the benefit of the presumption of the innocence?

Prospective Juror Charlton: Yes, Sir.

The Court: You're prepared to make the state prove his guilt beyond a reasonable doubt?

Prospective Juror Charlton: Yes.

The Court: And do you feel at this point as though you would be unfairly bias [sic] against anyone charged with that offense? In other words, do you think it would be difficult for you to give him a fair trial because he's charged with this particular offense?

Prospective Juror Charlton: I would try to be fair, Your Honor, but –

The Court: Any guarantees?

Prospective Juror Charlton: No guarantees.

The Court: Pardon?

Prospective Juror Charlton: I would try to be fair.

The Court: Can you guarantee that you will be fair?

Prospective Juror Charlton: Will I guarantee I'll be fair? I'll try to be fair.

The Court: Well, do you understand if you're in this seat you need a guarantee? And that's – I need to know that you'll be absolutely fair regardless of the nature of the charge, listen to all the evidence and make a decision not based on what your preexisting feelings are but based on the evidence.

Prospective Juror Charlton: I think I would be fair based on the evidence.

The Court: So you would have no hesitation if you felt that the state failed to prove its case beyond a reasonable doubt to come back with a not guilty verdict?

Prospective Juror Charlton: Exactly.

¶62 Based upon this questioning, the District Court denied Sather's challenge for cause.

¶63 During the initial appeal of this case in 2004, Stenerson did not appeal the District Court's denial of Sather's challenge for cause. Prior to the postconviction relief hearing, St. Germain's present counsel deposed Stenerson, without the State being represented, wherein

Stenerson admitted he was not familiar with the law at the time of the original appeal, but that he was now familiar with the law and he should have raised the issue originally. The District Court ruled that Stenerson's failure to appeal its decision not to dismiss juror Charlton for cause did not fall below an objective standard of reasonableness.

¶64 Despite Stenerson's subjective belief that he should have appealed the District Court's failure to dismiss juror Charlton for cause, we find that Stenerson's appellate performance, even if deficient, was not prejudicial to St. Germain. Had Stenerson raised the issue on appeal, we would have reviewed the district court's decision for an abuse of discretion. *State v. Rogers*, 2007 MT 227, ¶ 18, 339 Mont. 132, 168 P.3d 669.

¶65 In determining whether a juror should be excused for cause, the court must consider both the statutory language and the totality of the circumstances. *State v. Normandy*, 2008 MT 437, ¶ 22, 347 Mont. 505, 198 P.3d 834 (citing *State v. Robinson*, 2008 MT 34, ¶ 8, 341 Mont. 300, 177 P.3d 488). If the totality of a prospective juror's responses raises serious questions about his or her ability to be fair and impartial, the juror should be removed. *Normandy*, ¶ 22. If, however, the prospective juror merely expresses concern about impartiality but believes he or she can fairly weigh the evidence, the court is not required to remove the juror. *Normandy*, ¶ 22.

¶66 St. Germain argues that juror Charlton should have been dismissed for cause pursuant to § 46-16-115(2)(j), MCA, which provides in pertinent part:

> A challenge for cause may be taken for all or any of the following reasons or for any other reason that the court determines:

. . .

(j) having a state of mind in reference to the case or to either of the parties that would prevent the juror from acting with entire impartiality and without prejudice to the substantial rights of either party.

¶67 This Court's decisions in *Normandy* and *Rogers* provide guidance in our interpretation of § 46-16-115(2)(j), MCA. In *Normandy*, a prospective juror expressed his predisposition against domestic violence because it had affected his wife in her first marriage, but he did not voice a predisposition regarding the guilt or innocence of the defendant. *Normandy*, ¶ 23. Similarly, in *Rogers*, the prospective juror admitted he would likely start out wanting to think the defendant probably committed the sexual assault crime he was charged with. *Rogers*, ¶ 9. In both cases, the prospective jurors also stated they could sit on the jury, despite their predispositions, and fairly and impartially render a verdict. *Normandy*, ¶ 23; *Rogers*, ¶¶ 9, 25. This Court, in both cases, held that the district court did not abuse its discretion in denying the defendants' challenges for cause. *Normandy*, ¶ 25; *Rogers*, ¶ 26.

¶68 Juror Charlton's initial responses, like the jurors' responses in *Normandy* and *Rogers*, indicated he had a predisposition against people who had been convicted of a sexual offense. However, his "feelings regarding sexual assault are common among parents," *Rogers*, ¶ 25, and only relate to those individuals found guilty of a sexual offense, not those merely charged with a sexual crime, *see Normandy*, ¶ 23. Juror Charlton also stated he thought he could be objective, fair and impartial. During Sather's questioning, juror Charlton agreed that he might "lean towards" a young lady who was violated, but that he would try to be fair.

27

Juror Charlton further agreed to honor the presumption of innocence, hold the State to its burden of proof, and base his decision on the facts that evolved at trial. When questioned by the court, he admitted he would have no hesitation acquitting the defendant if the State failed to prove its case beyond a reasonable doubt.

¶69　Juror Charlton's comments contrast sharply with those of prospective juror Allen, who was questioned subsequently to juror Charlton. In response to Mr. Fulbright explaining the case, prospective juror Allen stated that she had the "most sickening feeling when [Fulbright] mentioned the case." Mr. Fulbright continued asking prospective juror Allen questions, and the following conversation took place:

> Mr. Fulbright: Let me ask the same direction I was asking over here. Is that feeling enough that it would interfere with your ability to look at this case and like any other case – no, that's not the right way to say it – to look at this case and remain objective and try to balance the facts?
>
> Prospective Juror Allen: I just know how I feel. I don't know how to explain it, but it's sickening.
>
> Mr. Fulbright: If you were in either parties' shoes, the state's or the defendant's shoes, would you be comfortable with you serving as a juror?
>
> Prospective Juror Allen: No. I just can't.

¶70　After this exchange, the court granted the State's motion to remove prospective juror Allen for cause. Unlike juror Charlton, prospective juror Allen demonstrated a clear bias, implicitly admitted she would be unable to remain objective, and would not feel comfortable if she were in the shoes of either party.

¶71 St. Germain also argues that it was improper for the District Court to rehabilitate juror Charlton. In *State v. Freshment*, 2002 MT 61, ¶ 18, 309 Mont. 154, 43 P.3d 968, this Court noted that "[c]oaxed recantations in which jurors state they will merely follow the law, whether prompted by the trial court, the prosecution, or the defense, do not cure or erase a clearly stated bias which demonstrates actual prejudice against the substantial rights of the party."

¶72 Here, juror Charlton had no clear bias demonstrating actual prejudice against the substantial rights of St. Germain. Juror Charlton's bias was only towards those found guilty of a sexual offense, of which St. Germain had yet to be convicted. In addition, the District Court did not coax juror Charlton into recanting his bias, but rather, inquired into his ability to rely on the facts placed before him, and hold the State to its burden of proof. In response, juror Charlton stated he would, thereby mitigating any bias.

¶73 We accordingly conclude that had Stenerson appealed the District Court's decision not to dismiss juror Charlton for cause, he would have been unsuccessful because the District Court did not abuse its discretion. St. Germain therefore has not demonstrated prejudice under the second prong of *Strickland* and he received effective assistance of counsel on this issue.

## CONCLUSION

¶74 For the reasons stated above, we affirm the District Court's dismissal of St. Germain's petition for postconviction relief.

/S/ MICHAEL E WHEAT

29

We Concur:


/S/ MIKE McGRATH
/S/ JIM RICE
/S/ PATRICIA COTTER
/S/ BETH BAKER