DA 08-0091

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 314N

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

MICHAEL MAX MILLER,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. DDC-06-366
Honorable Dirk M. Sandefur, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Jim Wheelis, Chief Appellate Defender; Lisa S. Korchinski, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

            Hon. Steve Bullock, Montana Attorney General; Micheal S. Wellenstein,
Assistant Attorney General, Helena, Montana

            John Parker, Cascade County Attorney, Great Falls, Montana

                      Submitted on Briefs:  July 29, 2009

                               Decided:  September 22, 2009

Filed:

_____
                         Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(d)(v), Montana Supreme Court 1996 Internal Operating Rules, as amended in 2003, the following memorandum decision shall not be cited as precedent. It shall be filed as a public document with the Clerk of the Supreme Court and its case title, Supreme Court cause number and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Michael Max Miller (Miller) appeals from the judgment of conviction and sentencing order of the Eighth Judicial District Court, Cascade County, following a jury trial finding him guilty of deliberate homicide of Lamar Windham (Windham). We affirm.

¶3 Miller raises the following issues on appeal:

¶4 Whether the District Court properly denied Miller's motion to dismiss for speedy trial violation.

¶5 Whether the District Court properly instructed the jury on witness credibility.

¶6 Whether the District Court properly denied Miller's motion to compel the mental health care records of a third-party witness.

¶7 Whether the prosecutors committed plain error in their closing statements concerning witness credibility and Miller's silence.

¶8 On June 25, 2006, Miller attended the funeral of his wife in Browning. Miller's brother-in-law, Windham, gave Miller a ride back to Great Falls in his van. Windham

2

called his sister-in law, Eva Little Youngman (Youngman), to tell her he made it to Great Falls. After returning to Great Falls, Windham and Miller picked up Al Johnson (Johnson). Johnson had known Miller for about two weeks and had not previously met Windham. The three men drank beer and schnapps while riding around town. Miller and Windham argued about their wives. The next morning, Windham and Miller picked Johnson up and they continued to drive around town drinking alcohol. Johnson quit drinking after two or three beers. At approximately 1:30 p.m., Windham drove to Rainbow Dam Overlook (Giant Springs area) and parked. Windham and Miller got out of the van and walked down a trail leading towards the river and dam. Johnson observed that Windham and Miller continued to argue, waved their hands, and cursed at each other. Johnson remained in the van because he did not feel well.

¶9 About 45 minutes later, Miller returned alone. Miller got in the driver's seat and said "let's go." Miller was sweating and out of breath. Johnson asked where Windham was. Miller responded that he did not know, and then added that Windham ran down the hill. Next Miller told Johnson that Windham went down the hill with some girl. Johnson responded that he had not seen any girls. Johnson talked Miller into waiting and looking around for Windham. Johnson asked Miller which direction they had gone, and Miller pointed in a different direction than they had previously gone. After Johnson called him out on this discrepancy, Miller went down the hill, looked for Windham, and told Johnson he could not see Windham anywhere. After waiting about 90 minutes, Miller told Johnson that he would take him home and then come back to look for Windham.

3

¶10 Over the next days, Miller told various people different stories. After dropping Johnson off, Gary Dogtakinggun asked about Windham's whereabouts. Miller did not want to talk about Windham and left. Miller later told a friend that Windham had jumped over some bushes out of sight, and Miller went part way down toward the bushes to look for Windham, but Miller never explained why he did not go further down the trail to find Windham. Miller told Terry Matt that he and Windham had an argument at the dam and Windham ran down the trail and never returned. Miller told Windham's neighbor, Robert Williams, that Windham went swimming below Giant Springs. Williams testified that Windham did not care much for the water and did not swim much. Miller continued to use Windham's van during this time, even telling Johnson that Windham had returned and allowed Miller to use his van. Windham's children testified that Windham never loaned his van to other people.

¶11 Windham's family began to worry and attempted to locate him. Youngman spoke with Miller by phone. Miller sounded anxious and told Youngman that Windham had gone swimming at Giant Springs with another man, but later said that Windham left with some girls. On July 13, 2006, Youngman and other family members traveled to Great Falls to look for Windham. They eventually contacted Johnson who told them what happened at Giant Springs. The family then found Miller who told different stories about what happened. Miller said that Windham was with some ladies, that they were swimming in the Missouri and Windham swam out too far and was never seen again, and that Windham may have taken off with one of the ladies out of state. Miller and Johnson accompanied Windham's family to Giant Springs. Miller took Windham's family in the

4

wrong direction, but Johnson corrected Miller and told the family the direction Windham actually went. At one point, some family members were close to where Windham's body was eventually found, but Miller hollered down that they had been further east from the dam. Family members noted that Miller was nervous during the search and did not seem to be trying hard to find Windham. Miller did not really respond to questions regarding why he had not tried harder to find Windham or call the police. After searching for 45 minutes, Johnson, Miller, and Windham's family went to the police station. When they arrived, Miller left without talking to the police. Johnson told the police what had happened.

¶12 On July 18, 2006, law enforcement searched the Rainbow Dam area and found Windham's badly decomposed body on the river bottom below the Rainbow Scenic Overlook cliff. Officers later found a Natural Ice beer can on a portion of the trail above the cliff. Natural Ice is the brand of beer that Windham, Miller, and Johnson had been drinking. DNA testing of the beer can excluded Windham as a possible contributor to the mixture, but could not exclude Miller. Miller was arrested and interviewed by officers investigating Windham's death. Miller acknowledged being at Giant Springs by the dam with Windham. Miller explained that Windham was running around acting crazy and that he could not keep up with him. Miller said that he walked back down the trail a little and yelled for Windham. Miller said he did not know where Windham went, denied telling anyone that Windham was swimming, and claimed he never saw Windham swimming. Miller also denied using Windham's van. Miller told the officers he did not report Windham as missing because of his outstanding warrant.

5

¶13 On July 27, 2006, the State charged Miller with deliberate homicide. Miller was incarcerated prior to trial and his case was continued several times. Miller filed several motions, including a motion to dismiss for speedy trial violation and a motion to compel production of Johnson's mental health records. The District Court denied each motion. After a five-day trial in November 2007, a jury found Miller guilty. Miller now appeals.

¶14 *Whether the District Court properly denied Miller's motion to dismiss for speedy trial violation.*

¶15 This Court clarified its speedy trial test in *State v. Ariegwe*, 2007 MT 204, ¶¶ 18-117, 338 Mont. 442, 167 P.3d 815. Whether a defendant has been denied the right to a speedy trial presents a question of constitutional law. *Ariegwe*, ¶ 119. We review de novo a district court's legal conclusions to determine whether the court correctly interpreted and applied the law. *Ariegwe*, ¶ 119. We will not disturb the factual findings underlying a speedy trial ruling unless the findings are clearly erroneous. *Ariegwe*, ¶ 119. A finding is clearly erroneous if it is not supported by substantial credible evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court committed a mistake. *Ariegwe*, ¶ 119.

¶16 When considering a speedy trial claim, the court balances the following four factors: 1) the length of the delay; 2) the reasons for the delay; 3) the accused's responses to the delay; and 4) prejudice to the accused. *Ariegwe*, ¶¶ 20, 34, 106-12. On September 27, 2007, the District Court conducted a hearing on Miller's speedy trial motion. Following testimony from Miller and argument from counsel, the court balanced these factors through a "rather lengthy analysis" from the bench. The District Court

6

weighed factor one, the length of the delay, heavily against the State, under the presumption of prejudice. The court weighed factor two, the reasons for the delay, moderately against the State as institutional delay. Factor three was also weighed moderately against the State, indicating that the Defendant sincerely wanted a speedy trial. Thus, the court weighed factors one, two, and three against the State. However, the District Court concluded that "the delay of this case has not caused any substantial or extraordinary prejudice to the Defendant." Thus, the court reasoned that factor four weighed heavily in favor of the State and overcame the presumption of prejudice under factor one, as well as the weight of factors two and three under the totality of the circumstances. Therefore, the District Court found no deprivation of Miller's right to a speedy trial under the *Ariegwe* test and denied Miller's motion to dismiss.

¶17 Our review of the record satisfies us that the District Court's legal conclusions correctly interpreted and applied the law. We further conclude that the District Court's findings are supported by substantial credible evidence, the District Court did not misapprehend the effect of the evidence, and our review of the record does not convince us that the District Court committed a mistake. Thus, the District Court's factual findings are not clearly erroneous. Therefore, we conclude that the District Court properly denied Miller's motion to dismiss for speedy trial violation.

¶18 *Whether the District Court properly instructed the jury on witness credibility.*

¶19 Miller objected to standard jury instruction MCJI 1-003, which states that when weighing witness testimony, jurors may consider: "Whether the witnesses have an interest in the outcome of the case or any motive, bias or prejudice." Miller argues that

7

this instruction offered unnecessary comment on the evidence by the court and instructed the jury to distrust the defendant's testimony more than any other testimony, since the defendant has the most obvious interest in the outcome of the case.

¶20    In considering whether a district court has correctly instructed the jury in a criminal case, "we determine whether the instructions, taken as a whole, fully and fairly instructed the jury on the law applicable to the case." *State v. Cybulski*, 2009 MT 70, ¶ 34, 349 Mont. 429, 204 P.3d 7. A district court has broad discretion when it instructs a jury, therefore we review a district court's decisions regarding jury instructions to determine whether the court abused its discretion. *Cybulski*, ¶ 34. This Court will only find reversible error if the district court's jury instructions prejudicially affected the defendant's substantial rights. *Cybulski*, ¶ 34.

¶21    The District Court did not abuse its discretion in giving standard jury instruction MCJI 1-003. Section 26-1-302(4), MCA, permits a jury to consider the "interest of the witness in the outcome of the litigation or other motive to testify falsely" when weighing witness credibility. Furthermore, the District Court specifically instructed the jury on Miller's presumption of innocence and the State's burden of proof. Read together, these instructions fairly instructed the jury on the law regarding witness testimony. Moreover, since Miller did not testify at trial, he cannot demonstrate any prejudice resulting from this instruction.

¶22    *Whether the District Court properly denied Miller's motion to compel the mental health care records of a third-party witness.*

¶23 Miller argues that the District Court should have granted his motion to compel Johnson's mental health records because Johnson was a key State witness who was present at the time of the crime. Miller attempts to distinguish precedent cited by the District Court by noting that those cases involved victim-witnesses who were minors, whereas he requested information from a key State witness who was neither a victim nor a minor.

¶24 This Court reviews evidentiary rulings and orders granting or denying discovery for an abuse of discretion. *State v. Duffy*, 2000 MT 186, ¶ 18, 300 Mont. 381, 6 P.3d 453.

¶25 The District Court did not abuse its discretion by declining to compel Johnson to provide his mental health care records to Miller. The District Court recognized that the State did not possess the requested health care information, that Johnson had a privacy interest in his mental health care information, and that Miller failed to show that he was entitled to such information. Because Johnson's mental health care information was not in the hands of the State, but rather in the hands of Johnson, who was a third party to the criminal proceedings, Miller had no state or federal constitutional due process or confrontation right to compel an in camera inspection and balancing test to determine whether such information is discoverable as a threshold matter. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51-61, 107 S. Ct. 989, 998-1003 (1987); *State v. Reynolds*, 243 Mont. 1, 6-8, 792 P.2d 1111, 1114-15 (1990); *State v. Little*, 260 Mont. 460, 466-68, 861 P.2d 154, 158-59 (1993). Furthermore, Johnson's mental health care information is protected by Montana's constitutional privacy provision set forth in Article II, § 10 of the

Montana Constitution. *St. James Community Hosp., Inc. v. Dist. Ct.*, 2003 MT 261, ¶ 8, 317 Mont. 419, 77 P.3d 534. Moreover, Johnson's mental health care information is privileged and protected from disclosure by state law. Sections 50-16-501 to -553, MCA (Uniform Health Care Information Act); §§ 50-16-801 to -818, MCA (Health Care Information Privacy Requirements for Providers Subject to HIPAA); § 26-1-807, MCA (Psychologist-client privilege).

¶26 Finally, Miller cannot demonstrate any prejudice from the District Court's ruling because Johnson testified at trial that at the time of the incident he was taking medication for bipolar disorder. Johnson acknowledged that he was not supposed to drink while taking his medication. Miller's counsel cross-examined Johnson regarding his mental health and argued in closing that the jury should evaluate Johnson's credibility in light of the alcohol he consumed and the medication he was taking.

¶27 *Whether the prosecutors committed plain error in their closing statements concerning witness credibility and Miller's silence.*

¶28 Miller acknowledges that he did not preserve this issue for appeal by objecting to the prosecutors' statements during closing argument. However, relying largely on *State v. Hayden*, 2008 MT 274, 345 Mont. 252, 190 P.3d 1091, Miller asks this Court to exercise plain error review of alleged prosecutorial misconduct during closing argument. In particular, Miller claims that the prosecutors offered personal opinions as to witness credibility, called Miller a liar while attesting to Johnson's credibility, and commented on Miller's right to remain silent. Miller argues that this alleged prosecutorial misconduct calls into question the fundamental fairness of the trial, thereby requiring a new trial.

¶29 While this Court generally does not review on appeal issues not raised before the district court, we may review such issues under the plain error doctrine when a defendant's fundamental constitutional rights are implicated. *Hayden*, ¶ 17. We invoke this discretionary review "sparingly" when failure to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process. *Hayden*, ¶ 17.

¶30 The prosecutorial misconduct warranting reversal in *Hayden* is easily distinguished from the facts here. In *Hayden*, this Court concluded that the prosecutor unacceptably invaded the province of the jury by eliciting the investigating officer's opinion on the credibility of other witnesses and by offering his own opinion regarding witnesses' testimony during closing argument. *Hayden*, ¶¶ 30-33. There is no suggestion here that the prosecutors elicited unacceptable opinion testimony from witnesses regarding the credibility of other witnesses at trial. All alleged prosecutorial misconduct here was confined to closing argument. A review of the prosecutors' entire closing argument regarding Johnson's credibility reveals that the prosecutors were reviewing the evidence supporting Johnson's credibility. A prosecutor may comment on the credibility of witnesses and inferences to be drawn from the evidence during closing argument. *State v. Green*, 2009 MT 114, ¶ 33, 350 Mont. 141, 205 P.3d 798. The record reflects that the prosecutors did not simply offer a personal opinion regarding Johnson's credibility, but properly argued that Johnson's conduct, as opposed to Miller's, showed that Johnson was credible. Similarly, we find nothing unacceptable about the

11

prosecutor's suggestion during closing that Miller lied when he stated he had only gone a little way down the trail. The prosecutor was drawing an inference from the DNA evidence gathered from a beer can found further down the trail where the confrontation likely took place.

¶31 Miller's claim that the prosecutor unacceptably commented on his silence misconstrues our precedent. Miller claims that the prosecutor improperly commented on his right to remain silent when the prosecutor stated that Miller said nothing to Windham's family even though he knew people were looking for Windham and when the prosecutor commented on Miller's refusal to go to the police. The prosecutor did not improperly comment on Miller's right to remain silent because his comments were not directed at Miller's post-*Miranda* silence. *State v. Clausell*, 2001 MT 62, ¶ 61, 305 Mont. 1, 22 P.3d 1111. The prosecutor here commented on Miller's failure to tell anyone about Windham's whereabouts prior to Miller's arrest. Thus, there was no *Doyle* error.

¶32 This Court has declined to exercise plain error review to reverse a criminal trial on the basis of alleged prosecutorial misconduct when prosecutors suggested during closing argument that defendants lied on the stand or when prosecutors offered personal opinions regarding witness credibility. *State v. Rose*, 2009 MT 4, ¶¶ 104-07, 348 Mont. 291, 202 P.3d 749; *State v. Lindberg*, 2008 MT 389, ¶¶ 16-19, 29-35, 347 Mont. 76, 196 P.3d 1252. Our review of the closing arguments here fails to persuade us that the prosecutors' comments resulted in a manifest miscarriage of justice, undermined the trial's fundamental fairness, or compromised the integrity of the judicial process. *Rose*, ¶ 107; *Lindberg*, ¶ 35. Thus, we decline to exercise our discretionary plain error review.

12

¶33 We have determined to decide this case pursuant to Section I, Paragraph 3(d) of our 1996 Internal Operating Rules, as amended in 2003, which provides for memorandum opinions. It is manifest on the face of the briefs and the record that the appeal is without merit because the issues are clearly controlled by settled Montana law; the issues are factual and there clearly is sufficient evidence to support the findings of fact below; and the issues are ones of judicial discretion and there clearly was not an abuse of discretion.

¶34 Affirmed.

/S/ MIKE McGRATH

We concur:

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ BRIAN MORRIS

13