DA 11-0493

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 131

MICHAEL M. MILLER,

      Petitioner and Appellant,

  v.

STATE OF MONTANA,

      Respondent and Appellee.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. DV 11-050
Honorable Dirk M. Sandefur, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Michael Max Miller, self-represented; Deer Lodge, Montana

      For Appellee:

      Steve Bullock, Montana Attorney General; Micheal S. Wellenstein,
Assistant Attorney General; Helena, Montana

Submitted on Briefs:  April 11, 2012

Decided:  June 19, 2012

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Appellant Michael Miller (Miller) appeals from the order of the Eighth Judicial District Court, Cascade County, dismissing his postconviction relief petition.  We affirm.

¶2     The sole issue is whether the District Court erred by dismissing the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     Miller was convicted of the deliberate homicide of his brother-in-law, Lamar Windham (Windham), after a jury trial.  Miller appealed, and we affirmed his conviction. *State v. Miller*, 2009 MT 314N, 352 Mont. 553, 218 P.3d 500 (table).  The facts of the case are detailed in that opinion, and we review only those facts necessary to resolve the issues in this appeal.

¶4     On June 25, 2006, Miller attended his wife's funeral in Browning and rode back to Great Falls with Windham in Windham's van.  The next day, Windham and Miller picked up Al Johnson (Johnson), a recent acquaintance of Miller's and new acquaintance of Windham's.  The three men drank alcohol and drove around town, eventually parking at the Rainbow Dam Overlook of the Giant Springs area.  Johnson remained in the van due to sickness, but he observed Windham and Miller arguing as they walked down a trail leading to the river and dam.  Less than an hour later, Miller returned alone, sweating and out of breath, and he got into the driver's seat of Windham's van.  Johnson inquired about Windham's whereabouts, and Miller responded with conflicting stories. Johnson talked Miller into waiting for Windham and looking for him.  After an hour and

2

a half, Miller said he would take Johnson home and come back to look for Windham. *Miller*, ¶¶ 8-9.

¶5 In the following days, Miller told different stories about what had happened to Windham. Miller continued to use Windham's van. Windham's family became concerned and contacted Johnson, who told them about what had happened at Giant Springs. Miller and Johnson drove to Giant Springs with Windham's family to search for Windham. Family members testified that Miller did not seem to be looking hard to find Windham. After failing to find Windham, the group went to police. While Johnson related his observations, Miller left before speaking to police. On July 18, 2006, law enforcement conducted a search of the area and found Windham's body on the river bottom below the cliff at the Rainbow Scenic Overlook. *Miller*, ¶¶ 10-12.

¶6 Miller was arrested and interviewed by law enforcement. He was charged with deliberate homicide and convicted by a jury in November 2007. *Miller*, ¶ 13. On appeal, Miller raised four issues to this Court: whether the district court properly denied his motion to dismiss for speedy trial violation, whether the district court properly instructed the jury on witness credibility, whether the district court properly denied his motion to compel the mental health care records of a witness, and whether prosecutors committed plain error in their closing arguments. *Miller*, ¶¶ 3-7.

¶7 Following his appeal, Miller filed a petition for postconviction relief in the District Court alleging his trial counsel rendered ineffective assistance because counsel: failed to object to the State's use of PowerPoint presentations during opening and closing

3

arguments and failed to request that the PowerPoint presentations be entered into the record; failed to object to the prosecutor's closing argument and rebuttal; failed to impeach Johnson; failed to impeach witness Ray Little Youngman; and failed to object to the prosecutor's comments made during Miller's motion to dismiss for insufficient evidence. Miller also argued that his appellate counsel's failure to raise his trial counsel's ineffectiveness on direct appeal constituted ineffective assistance. The court ordered that Miller be appointed counsel, but later vacated that order.[1]

¶8 The District Court dismissed Miller's petition for failure to state a claim pursuant to § 46-21-201(1)(a), MCA, reasoning that Miller had exhausted his remedy of appeal and that his ineffectiveness claims were record-based assertions which he did or reasonably could have raised on appeal. Miller requests that we reverse the dismissal of his petition and remand, grant an evidentiary hearing, and order appointment of counsel.

## STANDARD OF REVIEW

¶9 "We review a district court's denial of a petition for postconviction relief to determine whether the district court's findings of fact are clearly erroneous and whether its conclusions of law are correct." *Hammer v. State*, 2008 MT 342, ¶ 9, 346 Mont. 279, 194 P.3d 699 (citing *Whitlow v. State*, 2008 MT 140, ¶ 9, 343 Mont. 90, 183 P.3d 861). Ineffective assistance of counsel claims are mixed questions of law and fact that are reviewed de novo. *Whitlow*, ¶ 9 (citation omitted).

---

[1] The Office of the State Public Defender moved to vacate the order appointing counsel on the ground that appointment was premature under § 46-21-201, MCA, because the court had not yet received and reviewed the State's response. The court subsequently vacated its order compelling the appointment of counsel and denied the petition.

4

**DISCUSSION**

¶10　*Did the District Court err by dismissing Miller's postconviction petition?*

¶11　Miller argues that his appellate counsel rendered ineffective assistance by failing to raise claims of ineffective assistance against his trial counsel in the direct appeal. He argues the District Court erred in dismissing his claims against his appellate counsel as procedurally barred because he could not have raised such claims in his direct appeal. The State concedes that Miller's claims against his appellate counsel were not procedurally barred and should have been addressed on their merits, but argues the record is sufficient for this Court to resolve Miller's claims and that a remand is unnecessary. The State argues that appellate counsel's performance "was not deficient because there is no underlying merit to Miller's claims that his trial counsel provided ineffective assistance." Although district courts generally undertake initial consideration of ineffectiveness claims, *see Hagen v. State*, 1999 MT 8, ¶ 42, 293 Mont. 60, 973 P.2d 233, we agree with the State that the record is sufficient to permit review of the merits of the trial claims underlying Miller's appellate claims, making remand unnecessary.

¶12　The right to counsel in criminal prosecutions is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, and by Article II, Section 24 of the Montana Constitution. *St. Germain v. State*, 2012 MT 86, ¶ 8, 364 Mont. 494, ___P.3d___. "The right to counsel on appeal includes the right to effective assistance of counsel." *Hans v. State*, 283 Mont. 379, 408, 942 P.2d 674, 692 (1997) (citing *Evitts v.*

5

*Lucey*, 469 U.S. 387, 396, 105 S. Ct. 830, 836 (1985)), *overruled in part on other grounds*, *Whitlow*, ¶¶ 13, 20.

¶13     This Court reviews claims of ineffective assistance of appellate counsel like those of trial counsel. *St. Germain*, ¶ 7 (citing *Rogers v. State*, 2011 MT 105, ¶ 37, 360 Mont. 334, 253 P.3d 889). We analyze ineffective assistance of counsel claims by using the two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *Whitlow*, ¶ 10. "Under this test, the defendant must demonstrate (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defendant." *St. Germain*, ¶ 8 (citation omitted). In evaluating whether counsel's performance was deficient under the first prong, "we must determine whether counsel's representation fell below an objective standard of reasonableness considering prevailing professional norms and all the circumstances." *St. Germain*, ¶ 10 (citing *Whitlow*, ¶ 14). Under the second prong, "the defendant must show that, but for counsel's errors, a reasonable probability exists that the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings." *St. Germain*, ¶ 11 (internal citation omitted). In the context of a claim against appellate counsel, we have stated the standard as "whether there is a reasonable probability that, but for counsel's unprofessional errors, the petitioner would have prevailed on appeal." *DuBray v. State*, 2008 MT 121, ¶ 31, 342 Mont. 520, 182 P.3d 753 (citation omitted). A defendant must satisfy both prongs of the *Strickland* test to prevail on an ineffective assistance of counsel claim. *Whitlow*, ¶ 11

6

(citation omitted). If an insufficient showing is made on one prong of the test, we do not need to address the other prong. *Baca v. State*, 2008 MT 371, ¶ 16, 346 Mont. 474, 197 P.3d 948 (citing *Whitlow*, ¶ 11).

¶14 "We observe that counsel has no constitutional obligation to raise every non-frivolous issue on appeal. The presumption of effective assistance of counsel will be overcome only when ignored issues are clearly stronger than those presented." *Dubray*, ¶ 31 (citations omitted). "A petitioner for post-conviction relief must prove by a preponderance of evidence that he or she is entitled to relief." *Rogers*, ¶ 15 (citation omitted). "A defendant bears a heavy burden in seeking to overturn a district court's denial of postconviction relief based on ineffective assistance of counsel claims." *Baca* ¶ 16 (citing *Whitlow*, ¶ 21).

### A. Prosecutor's Closing Argument

¶15 Miller challenges his trial counsel's failure to object to the State's vouching for Johnson's credibility and to the prosecutor's statement that Miller had lied. In his direct appeal, Miller's appellate counsel raised these claims in the context of an argument requesting plain error review, as trial counsel had failed to object. *Miller*, ¶ 28. While we ultimately declined to exercise plain error review, we considered the claims and concluded that the prosecutor had not erred, noting "the prosecutors did not simply offer a personal opinion regarding Johnson's credibility, but properly argued that Johnson's conduct, as opposed to Miller's, showed that Johnson was credible. Similarly, we find nothing unacceptable about the prosecutor's suggestion during closing that Miller lied

when he stated he had only gone a little way down the trail. The prosecutor was drawing an inference from the DNA evidence gathered from a beer can found further down the trail where the confrontation likely took place." *Miller*, ¶ 30. We again determine that there is no merit to this claim.

### B. PowerPoint Presentations

¶16 The State utilized PowerPoint presentations in its opening and closing arguments. After the jury had rendered its verdict, Miller's trial counsel requested orally, followed by a written motion, that the PowerPoint presentations be entered into the record, noting that the State had not moved for their admission. Counsel acknowledged he had no objection to them, but argued they should be included for purposes of having an accurate record. The District Court denied the motion "due to the lack of a contemporaneous pre-verdict objection at trial and due to the lack of any specific showing of actual or potential prejudice or error."

¶17 Miller simply argues that his trial counsel's failure to either object to the State's use of the presentations or timely request that they be entered into the record was ineffective assistance. However, he has not demonstrated how counsel's inaction, even if improper, has prejudiced him. *See Whitlow*, ¶ 10. Thus, the claim is without merit.

### C. Credibility of Witness Al Johnson

¶18 Miller alleged that his trial counsel was ineffective by failing to impeach Johnson's testimony regarding his drinking, the parking lot where the van was parked, Johnson's sleeping, and the van keys.

8

### 1. Drinking

¶19 Johnson testified that the entire group had been drinking on the day in question, but that he had drunk only two or three beers. Later in his testimony, Johnson acknowledged he had drunk three or four beers. Noting Johnson's inconsistent statements, including an earlier interview in which Johnson said he had four or five beers, Miller argues his trial counsel was ineffective in failing to impeach Johnson's testimony by the "five beer" statement.

¶20 However, Miller's trial counsel emphasized Johnson's drinking. During cross-examination of Officer David Phillips, lead detective at the time of Windham's death, defense counsel asked, "you earlier testified that [Johnson] said he drank a substantial amount of alcohol, correct?" Phillips responded, "Correct." In the State's closing argument, the prosecutor said that Johnson had testified he "only drank five beers," to which defense counsel responded in argument, "Now, the State says, ah, he [Johnson] only had five or six beers." These statements correspond to the number which Miller emphasizes in his argument. Therefore, we conclude there was no prejudice to Miller occasioned by counsel's failure to further emphasize Johnson's conflicting testimony about how much he drank that day.

### 2. Parking lot

¶21 The Giant Springs area has two parking lots, described at trial as the "lower" (Rainbow) and "upper" (Lewis and Clark) lots. Johnson testified that Windham had parked his van in the lower lot. Miller argues his trial counsel was ineffective by failing

to impeach Johnson's trial testimony with his prior statements that they had parked in the upper lot.

¶22 Miller's counsel asked Johnson during cross-examination if he recalled making a statement to law enforcement that they had parked at the upper lot, rather than the lower lot. Johnson affirmed, "Yes, sir." When cross-examining Officer Phillips, Miller's counsel focused on the fact that Miller knew they had parked in the lower lot, but Johnson did not. In closing argument, Miller's counsel used the issue to argue that Johnson was confused:

> Mr. Al Johnson, who they want to use, Al Johnson told Phillips, even though he said on the stand that it was the lower parking lot, he told Phillips in a taped interview and Detective Phillips said that, that they were at the upper parking lot, not the lower. Who's confused here?

The record demonstrates that Miller's counsel used Johnson's inconsistent statements to Miller's advantage, and we conclude that Miller's claim is without merit.

### 3. Johnson sleeping

¶23 Johnson testified that Miller and Windham were arguing and that, when they got out of the van, Windham said "he ought to whip Mr. Miller's ass." Johnson testified that the men were gesturing and cursing at each other as they were walking down an embankment, and then Johnson lost sight of them. Johnson said that he lay down on the mattress in the van for about 30 to 45 minutes, but did not sleep.

¶24 Miller recites a police interview in which Johnson stated he slept for one hour and forty-five minutes, and another in which he said he slept for two hours. Miller alleges his trial counsel was ineffective for not impeaching Johnson's story with these

10

inconsistencies. However, we agree with the State that Miller's trial counsel did so. During defense counsel's cross-examination of Johnson, the following dialogue took place:

> Q. Okay. So at that point you didn't hear them? Did you fall asleep in the van?
> A. No, sir.
> Q. If the transcript of the police officer interview of you indicates that you said, in fact, that you did fall asleep, would that be, do you recall saying that?
> A. No, sir. I can't remember.
>
> .   .   .
>
> THE WITNESS: My recollection, I don't remember falling asleep.
> [Trial Counsel]:
> Q. Do you remember making that statement?
> A. No, sir.
> Q. You don't remember telling the officer you went to sleep for an hour, an hour and 45 minutes?
> A. No, sir.

Further, during cross-examination of Officer Phillips, Miller's counsel obtained Officer Phillips' confirmation that Johnson had told him "he was sleeping for that hour and 45 minutes."

¶25 Miller's trial counsel demonstrated the inconsistencies in Johnson's statements about sleeping and thus did not render ineffective assistance on this ground.

**4. Keys**

¶26 Johnson testified that Miller returned to the van alone, got into the driver's seat of the van, and said "let's go." When the prosecutor asked Johnson whether he saw Miller

put the key in the van to start it, Johnson answered, "I don't remember the key" and testified he did not think the keys were in the ignition when Miller returned to the van.

¶27 Miller argues his trial counsel was ineffective for failing to impeach Johnson's testimony with prior inconsistent statements on this issue. However, trial counsel did so. On cross-examination, Miller's trial counsel asked Johnson as follows:

> Q. Okay. Do you recall -- now, you testified about the keys in the ignition, do you recall that, where they were?
>
> . . .
>
> A. I believe they were out.
> Q. You believe they were out?
> A. Yes, sir.
> Q. Okay. Do you recall when you were interviewed by the police officers telling them that the keys were still in the ignition?
> A. No, sir.
> Q. Do you recall telling them that you could see them hanging down from the ignition?
> A. No, sir.
> Q. I want to approach you again, Mr. Johnson. Do you recall this part of the interview right there?
> A. Of course not.
> Q. You don't remember telling them they were just in the ignition?
> A. No, sir.
> Q. Right-hand steering column?
> A. No.[2]

During Miller's cross-examination of Officer Phillips, Phillips acknowledged that Johnson told him the keys were in the ignition of the van. Further, during closing argument, Miller's counsel emphasized Johnson's inconsistencies about the keys:

---

[2] A sidebar conference with the court was held at this juncture about proper use of prior inconsistent statements.

Let's talk about the key. Oh, the key that my client, the State wants to say, knocked [Windham] out or whatever he did and then takes the key off leaving the whole entire key ring. Why anyone would do that who knows. And then comes back with that key.

And Mr. Johnson testified in court, I didn't think the key was in the ignition. But what did he tell Detective Phillips in his interview a year and a half ago? Al Johnson said the key was in the ignition. You see the pictures. You can understand why someone might separate their keys because of the condition of that, the wires hanging down, the ignition hanging down.

I submit to you what Al Johnson said originally was accurate. That's where the key was. There's no magic key, there's no evidence that my client committed anything.

We conclude Miller's claim of ineffectiveness on this ground is without merit.

### D. Credibility of Witness Ray Little Youngman

¶28 Miller claims his trial counsel was ineffective for failing to impeach the testimony of Ray Little Youngman, Windham's stepson, on two issues. On the first, Youngman testified that Miller had given various accounts about Windham's whereabouts. Specifically, Youngman testified that Miller had said Windham "was at the Missouri swimming. And then [Miller] told me that [Windham] swam way out there and they never did see him after that." Miller had also offered that Windham was "with some ladies," and Windham may have gone out of state with one of the ladies. However, when asked where this conversation with Miller occurred, Youngman gave inconsistent answers, saying it occurred in a house and also in a van.

¶29 Miller's trial counsel recognized this issue and challenged Youngman's testimony. During counsel's cross-examination of Youngman, Youngman stated, "No, it wasn't in the house. . . . It was in the van." Counsel clarified, "In the van?" Youngman

13

responded, "Yeah. When he was, when we all start questioning him was in the van," explaining that there were six people in the van. Counsel asked: "And all six of you would have heard those conversations; is that correct?" Youngman affirmed, "Yeah." Thereafter, counsel impeached Youngman's testimony about Miller's stories in the van during cross-examination of Mary Griffin, Youngman's aunt. Griffin was one of the family members in the van. During counsel's cross-examination, Griffin testified that she did not remember any discussions with Miller in the van. Counsel further inquired, "And you said that [Miller] was pretty quiet the whole time; is that correct?" She responded, "Yeah. Usually [Miller] ain't quiet. But at that time he was." Counsel asked, "While you guys were driving up, did [Miller] make statements where [Windham] was?" to which Griffin responded, "No. He just sat in the back." Counsel asked, "Did he make any statements about [Windham] swimming or anything like that?" Griffin responded, "Huh-uh. I didn't hear him." Counsel asked, "And you would have heard him if he had said something?" Griffin responded, "Yeah. Because we were all in the van together."

¶30 During closing argument, counsel emphasized this discrepancy:

> Now, [Youngman] testified that while in the van with Eva, with [Griffin], Eva's husband and other individuals that Max Miller made four or five different stories about what happened at the dam. Curiously, every other witness that the State called that was in that van, a room smaller than this jury box did not recall those statements.
>
> I submit to you that there is a happy meal being sold here, but it's by the Government. They are throwing whatever it takes up in the hopes that you will take something from there and convict my client of a crime he did not commit. I ask you to consider all that testimony and how it is so unlikely that that would be said and no one else would hear it.
>
> I submit to you that it was completely fabricated.

¶31    On the second issue, Miller claimed his trial counsel failed to challenge Youngman's testimony that Miller had given misdirection to the family when searching for Windham. Youngman testified that, during the search: "[Miller], he hadn't, he didn't help us, he was standing on the hill just directly, you know, directing us where they was at and where . . . Miller thought [Windham] was." Asked whether he thought Miller was telling him to change directions, Youngman replied, "yeah, when we was going opposite of east, he, [Miller] told us that it was further down. So that's going down east more of the, of Giant Springs. And then where they found my dad, Lamar Windham, that's where we almost found him. We was maybe like 30, I don't know, 20 feet away from his body. If we would have walked a little further we would have found [Windham]." The prosecutor asked, "Why didn't you walk further?" Youngman replied, "Because [Miller] was hollering saying it was down, further down east more from the dam."

¶32    However, counsel did challenge Youngman's testimony through his cross-examination of Griffin, obtaining her testimony that Miller had not yelled down at Youngman and the other family members. Counsel clarified, "And [Miller] never was yelling down at [Youngman and other family members] down below?" Griffin reiterated, "No, he was not." Further, counsel referenced the issue in closing argument, arguing that even though "the State wants to have you believe that Max Miller was directing them away from where the body was found," the evidence revealed otherwise.

15

¶33    We agree with the State that Miller's trial counsel impeached Youngman's testimony through cross-examination of Griffin and emphasized these discrepancies in closing argument.  There is no merit to Miller's claim that his trial counsel provided ineffective assistance by failing to impeach Youngman's testimony.

### E.  Prosecutor's Argument opposing Miller's motion to dismiss.

¶34    At the close of the State's case-in-chief, Miller's trial counsel moved to dismiss based on insufficient evidence, arguing that the State had not produced evidence showing Miller had committed a homicide.  The State responded by recounting the evidence to the contrary, including the testimony of a forensic pathologist, Dr. Walter Kemp.  The District Court denied Miller's motion, and Miller claims his trial counsel was ineffective for failing to object to the prosecutor's reference to Kemp's testimony because Kemp had testified that Windham's manner of death was "undetermined."[3]  The State responds that the prosecutor's comments were not objectionable, and alternatively, even if objectionable, Miller suffered no prejudice because the denial of the motion was premised on more than just Dr. Kemp's testimony.

¶35    The District Court cited the following evidence in denying Miller's motion: Miller was at the scene; was the last person to see Windham alive; had the opportunity to cause Windham's death; argued with Windham immediately preceding Windham's death; after Windham's disappearance returned to the van sweating, nervous and in a

---

[3] Kemp testified that Windham's death was caused by blunt force injuries to the head and neck. On cross-examination, Kemp testified that he viewed the manner of death to be "undetermined." He testified that it was possible Windham's death was accidental, but he also testified that he could not rule out that the death was a suicide or homicide.

16

hurry to leave the scene; did not report Windham's disappearance to law enforcement; gave differing accounts of what happened to Windham; gave an interview to law enforcement that was not honest, which could lead to an inference he was concealing Windham's death; and exhibited suspicious or erratic conduct after Windham's disappearance that could indicate consciousness of guilt. The District Court did not mention Kemp's testimony in denying Miller's motion, but merely referenced forensic evidence in a general manner: "Then we get to the forensic evidence which is indeterminate alone, but due to the light most favorable with the State and when considered with other circumstantial evidence could reasonably be consistent with a criminal homicide."

¶36　We agree that the prosecutor's reference to Kemp's testimony was not prejudicial, and we need not address the first prong of the *Strickland* test. *See Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069; *State v. Miner*, 2012 MT 20, ¶ 22, 364 Mont. 1, 271 P.3d 56. The claim is without merit.[4]

---

[4]Miller also claims his trial counsel was ineffective by failing to object to allegedly inflammatory remarks made in the prosecutor's rebuttal argument. Miller cites a case for authority, *U.S. v. Rusmisel*, 716 F.2d 301 (5th Cir. 1983), but he has not advanced a cogent argument as required by § 46-21-104(2), MCA, *see Rogers*, ¶ 33, and M. R. App. P. 12(1)(f). *See DuBray*, ¶ 26. Miller has not shown "that counsel's trial objection would have been proper and that the court likely would have sustained the objection." *See Rogers*, ¶ 16 (citation omitted). Accordingly, Miller has not demonstrated that his counsel's performance was deficient and that he suffered any prejudice therefrom. *See Whitlow*, ¶ 10. He also cites cases for the proposition that trial attorneys are ineffective for failing to request an instruction regarding lesser included offenses, but does not provide a supported argument. These claims fail.

## CONCLUSION

¶37     Miller's claims against his trial counsel are without merit, and thus, he cannot state a claim of ineffectiveness against his appellate counsel for failing to raise ineffectiveness claims against his trial counsel in his direct appeal.

¶38     Affirmed.[5]


                                        /S/ JIM RICE


We concur:

/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ BRIAN MORRIS

---

[5] Although the District Court denied Miller's petition on procedural grounds, we conclude that it reached the right result, though for the wrong reason. *See State v. Ellison*, 2012 MT 50, ¶ 8, 364 Mont. 276, 272 P.3d 646 (citation omitted).