FILED

06/23/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0226

DA 19-0226

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 163

KATIE IRENE GARDING,

      Petitioner and Appellant,

    v.

STATE OF MONTANA,

      Respondent and Appellee.

APPEAL FROM:     District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV-15-969
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Larry D. Mansch, Toby Cook, Caitlin Carpenter, Montana Innocence
Project, Missoula, Montana

          E. Lars Phillips, Tarlow Stonecipher Weamer & Kelly, PLLC, Bozeman,
Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General, Helena, Montana

          Kirsten H. Pabst, Missoula County Attorney, Missoula, Montana

Submitted on Briefs: March 26, 2020

Decided: June 10, 2020

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Katie Irene Garding (Garding) appeals the denial of her petition for postconviction relief and an order granting partial summary judgment in favor of the State entered by the Fourth Judicial District Court, Missoula County. We affirm, and restate the issues as follows:

1. *Did the District Court err by denying Garding's petition for postconviction relief based on her claim of ineffective assistance of counsel?*

2. *Did the District Court err by concluding the State did not fail to disclose exculpatory evidence?*

3. *Did the District Court err by concluding Garding failed to present newly discovered evidence?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶2 Garding's conviction of vehicular homicide arises out of a tragic incident leading to the death of Bronson Parsons (Parsons) from injuries he sustained after being hit by a vehicle while walking along Highway 200 in East Missoula, in the early morning hours of January 1, 2008. *State v. Garding*, 2013 MT 355, ¶ 5, 373 Mont. 16, 315 P.3d 912. Parsons had been walking with a friend, Daniel Barry (Barry), who testified Parsons was hit by a bigger, dark-colored SUV or truck, possibly with a deer guard or other front end attachment. Another eyewitness, Deborah Baylor (Baylor), also reported that a dark-colored vehicle had hit Parsons with its passenger side. After the impact, the vehicle drove off. *Garding*, ¶¶ 5-6. After a lengthy period of investigation, the State charged Garding with vehicular homicide, leaving the scene of a fatal crash, tampering with evidence, and driving a motor vehicle without a valid license.

¶3    The case proceeded to a jury trial in 2011.  In addition to the testimony of Barry and Baylor, the State provided testimony from the two Montana Highway Patrol officers who had conducted the investigation.  The State did not retain an expert to conduct an accident reconstruction, and the officers did not conduct one.  However, the State did provide the expert testimony of Dr. Gary Dale, the medical examiner who had examined Parsons.  Dr. Dale testified the location and size of Garding's bumper was consistent with the injuries sustained in Parsons' calves.  *Garding*, ¶ 15.

¶4    In response to cross examination by Garding's counsel, Dr. Dale acknowledged that any vehicle with a bumper of the same height could have caused Parsons' injuries.  Further, Garding's counsel presented the testimony of an expert forensic pathologist, Dr. Thomas Bennett (Dr. Bennett), that the irregular bruising on Parsons' calves could not have been caused by a bumper like the one on Garding's vehicle.  *Garding*, ¶¶ 15, 32.

¶5    The jury heard testimony from Gabrielle Weiss (Wiess), who law enforcement initially suspected of hitting Parsons.  *Garding*, ¶ 9.  Weiss had made an unusual 911 call around the time of the accident, during which she identified herself as being in East Missoula.  However, Weiss later explained she was reacting to an emergency when she called 911, and that she was actually in the Blue Mountain area at the time.  Law enforcement agreed with Weiss after reviewing her cell phone records, and believed she was not driving the vehicle involved in the accident.  Garding's counsel questioned Weiss, the investigating officers, and a Verizon representative who testified about Weiss' cell phone records, about Weiss' story.  Garding's counsel emphasized that Weiss' vehicle contained a fabric impression from a pair of jeans, and that Verizon was unable to analyze

3

several of Weiss' phone records. Garding's counsel pointed out inconsistencies in Weiss' story regarding her location, and secured an admission from Weiss on cross examination that she could not remember much about the night because she had been drinking heavily.

¶6 Highway Patrol Trooper Richard Hader (Trooper Hader) testified that the case went cold after police ruled out Weiss as a suspect, until he received a lead from Teuray Cornell (Cornell) almost one year after the accident. Cornell, at the time detained at the Missoula County Detention Center, contacted Trooper Hader to report that he had information about the accident. Cornell related to Trooper Hader that Garding had driven to his house later in the day on January 1, 2008, told him that she had hit a deer, and asked him to fix a broken light on the front of her vehicle, which Cornell did by affixing it with tape. *Garding*, ¶ 10. On cross examination at trial, Garding's counsel got Cornell to acknowledge that he could not say with certainty whether Garding actually told him she hit a deer on the day he fixed her light. Garding's counsel also highlighted several different versions of the story Cornell had provided to police, and also elicited testimony from Cornell and Trooper Hader that Cornell was seeking to get out of jail when he contacted police regarding the accident. Garding's counsel also elicited testimony from Cornell's cellmate at the time that Cornell had told the cellmate he was going to lie to police about the accident.

¶7 Other primary witnesses in the case were James Bordeaux (Bordeaux) and Paul McFarling (McFarling), both of whom were passengers in Garding's vehicle on the night in question. Bordeaux, Garding's boyfriend at the time, testified that he and Garding had started drinking around 11:00 a.m. on December 31st, and met up with McFarling that afternoon. He reported the three of them continued to drink throughout the afternoon and

evening, including at Red's Bar in Missoula and the Reno Bar in East Missoula. *Garding*, ¶ 12. After midnight, they went to a friend's house to purchase cocaine and, after they were unsuccessful, returned to Red's Bar. Garding hit the curb as she parked, and an officer observing this instructed her not to drive for the rest of the night. About 1:30 a.m., they left Red's Bar, with Garding driving, to again attempt to purchase cocaine in East Missoula. During this drive, Bordeaux testified that McFarling, who was sitting in the back seat, pulled out a gun and attempted to show it to Bordeaux. Bordeaux, who was sitting in the front passenger's seat while Garding was driving, turned around and started arguing with McFarling about the gun, causing a commotion in the vehicle. Bordeaux testified that, upon an impact, he spun around in his seat just in time to see a person flying through the air, and that Garding had stated, "I hit somebody." *Garding*, ¶12. Bordeaux testified they were "in a panic about what to do," Garding did not stop the vehicle, and instead, she drove back to Red's Bar, where she attempted to park close to the same spot where they had been parked when the officer told Garding not to drive that evening. Then, the three got into McFarling's vehicle and drove to Missoula, where the three stayed the night at McFarling's house. *Garding*, ¶ 12.

¶8      In exchange for his testimony, Bordeaux obtained a plea deal regarding a burglary charge arising out of the theft of McFarling's gun, which occurred the morning following the accident. *Garding*, ¶ 13. Garding's counsel attacked Bordeaux's credibility at trial by focusing on his plea deal and highlighting inconsistencies in the stories Bordeaux had given to police. Garding's counsel also emphasized the testimony of McFarling, who consistently stated he did not remember Garding hitting anything with the vehicle that

night. Further, Garding's counsel had McFarling explain that he had no reason to lie to protect Garding, as he believed Garding aided Bordeaux in stealing his gun.

¶9 The jury found Garding guilty of vehicular homicide while under the influence, failure to stop immediately at the scene of an accident involving an injured person, and driving without a valid driver's license. *Garding*, ¶ 17. Garding appealed, challenging evidentiary rulings made by the District Court regarding witnesses, cross examination, and Garding's expert witness. *Garding*, ¶¶ 2-4. This Court affirmed, and the United States Supreme Court subsequently denied Garding's petition for writ of certiorari. *Garding v. Montana,* 574 U.S. 863, 135 S. Ct. 162 (2014).

¶10 On September 15, 2015, Garding, represented by the Montana Innocence Project, filed a petition for postconviction relief (Petition), raising three claims: ineffective assistance of counsel (IAC), discovery violations under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), and newly discovered evidence of her innocence. Specifically, Garding claimed her trial counsel had been ineffective for failing to hire an accident reconstructionist; that the State had failed to produce x-rays of Parson's legs and photographs of an unrelated 2005 vehicle-pedestrian accident, both of which she claimed were exculpatory; and that post-trial accident reconstructions produced by new experts constituted new evidence that proved Garding's innocence.

¶11 The State filed motions for summary judgment on Garding's newly discovered evidence claims and her Brady claim regarding Parsons' x-rays, which the District Court granted after a hearing. The District Court then conducted a hearing on the remainder of Garding's claims, after which it denied the Petition in March of 2019. Garding appeals.

6

## STANDARD OF REVIEW

¶12     This Court reviews a district court's denial of a petition for postconviction relief to determine whether its factual findings are clearly erroneous and whether its legal conclusions are correct. *Rose v. State*, 2013 MT 161, ¶ 15, 370 Mont. 398, 304 P.3d 387 (citing *Rukes v. State*, 2013 MT 56, ¶ 8, 369 Mont. 215, 297 P.3d 1195). Ineffective assistance of counsel claims are mixed questions of law and fact which we review de novo. *Rose*, ¶ 15 (citing *Miller v. State*, 2012 MT 131, ¶ 9, 365 Mont. 264, 280 P.3d 272).

## DISCUSSION

¶13     *1. Did the District Court err by denying Garding's petition for postconviction relief based on her claim of ineffective assistance of counsel?*

¶14     Garding argues, based primarily on an affidavit provided by her trial counsel, that the District Court erred by concluding her trial counsel did not render ineffective assistance by failing to hire an accident reconstructionist. In response, the State argues Garding's counsel was effective and that this court should not be persuaded by counsel's affidavit.

¶15     This Court analyzes ineffectiveness claims pursuant to the two-prong test articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861. Under *Strickland*, the defendant must prove "(1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defense." *Whitlow*, ¶ 10 (citing *State v. Racz*, 2007 MT 244, ¶ 22, 339 Mont. 218, 168 P.3d 685). If the petitioner cannot satisfy both of these elements, the claim will be denied. *Whitlow*, ¶ 11. "Thus, if an

insufficient showing is made regarding one prong of the test, there is no need to address the other prong." *Whitlow*, ¶ 11 (citation omitted).

¶16   Under the first prong, the defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Whitlow*, ¶ 16 (quoting *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066). This Court then determines "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Whitlow*, ¶ 16 (quoting *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066) (emphasis omitted). In determining whether counsel's performance was deficient, this Court applies "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Whitlow*, ¶ 15 (quoting *Strickland*, 466 U.S. at 689 104 S. Ct. at 2065) (internal quotations omitted). Important in this consideration is the need "to eliminate the distorting of effects of hindsight . . . and to evaluate the conduct from counsel's perspective at the time." *Whitlow*, ¶ 15 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065) (internal quotations omitted). Therefore, "self-proclaimed inadequacies on the part of trial counsel in aid of a client on appeal do not hold great persuasive value with this Court." *State v. Trull*, 2006 MT 119, ¶ 22, 332 Mont. 233, 136 P.3d 551.

¶17   Our examination of the trial record "in light of all the circumstances," *Whitlow*, ¶ 16, leads us to the conclusion that Garding's trial counsel presented an extensive and strong defense. She countered or sought to undermine virtually every evidentiary contention introduced by the State, and the jury was left with the unenviable task of making numerous

8

credibility determinations in order to resolve evidentiary conflicts necessary to reach a verdict.

¶18     To counter the State's expert medical testimony, trial counsel retained Dr. Bennett, a forensic pathologist. Dr. Bennett testified extensively regarding his expert opinion that Garding's bumper could not have caused Parsons' injuries. *See Garding*, ¶ 32 ("Dr. Bennett repeatedly testified that Garding's vehicle did not cause the injuries to Parsons' calves. Each time, Dr. Bennett supported his opinion with extensive analysis of the bruising, which he characterized to the jury as 'the best way to look for the nature of that instrument [Garding's bumper].'"). Consistent therewith, Garding's counsel highlighted possible flaws in the police's investigation and reports, as well as the forensic analyst's work. She elicited multiple concessions from Dr. Dale on cross examination that any other vehicle with a bumper the same height as Garding's could have caused Parsons' injuries, and that he could not definitely state that Garding's vehicle had caused the injuries.

¶19     Garding's counsel broadly attacked Bordeaux's critical eye witness testimony. She challenged his credibility by emphasizing his motivation to testify in exchange for receiving a plea deal on his own charges. *Garding*, ¶ 24 (the District Court gave Garding's counsel "wide latitude in cross-examining Bordeaux about his bias and motivation to testify falsely[.]"). She called into question the accuracy of his story by highlighting several inconsistent statements he provided during police interviews. She directly contradicted his version of the events by having McFarling state several times that Garding had not hit anything that night. She bolstered McFarling's credibility by emphasizing that he had no reason to lie for Garding. Likewise, with regard to Cornell, counsel effectively

9

examined the inconsistencies in his statements to police regarding whether Garding or Bordeaux was driving that day, and prompted him to admit uncertainty about whether Garding had actually told him she hit a deer the day he taped her light.

¶20 Garding's counsel provided multiple alternative theories about what happened the night Parsons was hit, including the stories of two other suspects. She had the police's original suspect, Weiss, admit she had changed her story about her location that night from East Missoula to Blue Mountain, and that she did not well remember what happened because she was heavily intoxicated. She highlighted the jean fabric impression found on the bumper of Weiss' vehicle, and attacked the State's handling of that evidence. *See Garding*, ¶ 37 ("Garding thoroughly cross-examined [the forensic analyst] about the failure to compare the fabric impressions on Weiss' bumper to the clothing of the victim or any other relevant party."). Counsel raised the potential involvement of a suspect named Josh Harrison, who was reported to have bragged during a party that night that he had hit someone with his car.

¶21 Garding's counsel elicited testimony pointing to several unanswered questions regarding the State's timeline and overall theory of the case, including a phone call Garding made near the time Parsons was struck, the origin of glass and marking on Parsons' clothing, and potentially incomplete cellular phone tower data that could have mapped Garding's location on the night in question.

¶22 Against the entirety of the trial record, Garding claims ineffective assistance because her counsel did not pursue another possible defense tactic—the hiring of an accident reconstructionist. Notably, the State did not pursue an accident reconstruction

either. We must start with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Whitlow*, ¶ 15 (citing *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). However, we need not rely solely on the strong presumption, because, as discussed above, the trial record here proves convincingly that Garding's counsel presented a strong defense.[1] Garding's claim would require the Court to engage in second guessing with "20/20 hindsight" of the choices made by her counsel. Only after a trial and guilty verdict can it be known that "Plan A defense" did not succeed, and raise interest in a "Modified Plan A defense" or an alternative "Plan B defense," but the law expressly prohibits such consideration. *See State v. Llamas*, 2017 MT 155, ¶ 26 388 Mont. 53, 402 P.3d 611 ("there are 'countless ways to provide reasonable assistance in any given case,'" (citing *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065)). Instead of strategic alternatives, we are to consider whether the performance actually rendered by counsel constituted reasonable professional service under the circumstances, with a strong presumption that it did. *Whitlow*, ¶ 15 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065).[2]

---

[1] A legal expert for Garding testified during the postconviction hearing that Garding's trial counsel "did a pretty good job."

[2] The District Court noted the observation made in *Harrington v. Richter*, 562 U.S. 86, 109, 131 S. Ct. 770, 790 (2011), that "[i]t sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." While that may be true in any particular case, including this one, we have held, as did *Strickland*, that there can be more than one way to provide reasonable professional assistance in defense of a criminal charge. *See Cheetham v. State*, 2019 MT 290, ¶ 14, 398 Mont. 131, 454 P.3d 673 ("While pursuing the Report further, using it at trial, and supporting it with available expert testimony may well have been a reasonable strategy, we cannot conclude that the strategy [defense counsel] elected to pursue was not also a reasonable approach.").

¶23　Given the efforts of her trial counsel, we conclude Garding's IAC claim based on the failure to hire an accident reconstructionist has not established that counsel's representation was "outside the wide range of professionally competent assistance," as required by the first prong of the *Strickland* test. *Whitlow*, ¶ 16 (quoting *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066) (emphasis omitted). Trial counsel's affidavit, drafted for her by Garding's PCR counsel, constitutes "self-proclaimed inadequacies" that "do not hold great persuasive value with this court," in light of the trial record. *Trull*, ¶ 22. Having so concluded, we need not reach the second prong of the *Strickland* test.

¶24　*2. Did the District Court err by concluding the State did not fail to disclose exculpatory evidence?*

¶25　Garding argues the State violated her due process rights by failing to provide two pieces of evidence: x-rays of Parsons' injuries, and photographs from an unrelated 2005 vehicle-pedestrian accident that Dr. Dale independently obtained following his testimony, and did not provide to the County Attorney. As to the victim's x-rays, the State argues they were separately possessed by the Crime Lab, were known to Garding and referenced by her expert, and could have been obtained by Garding. About the 2005 photographs, the State argues they were immaterial and would not have changed the outcome of the case.

¶26　Under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, the State must provide to the defense any evidence material to the defendant's guilt or punishment. *See also State v. Jackson*, 2009 MT 427, ¶ 52, 354 Mont. 63, 221 P.3d 1213. A prosecutor also has a "continuing duty to promptly disclose any additional, discoverable evidence." *Jackson*, ¶ 52 (citing § 46-15-327, MCA). A failure to disclose exculpatory evidence violates the

12

defendant's Fourteenth Amendment guarantee of due process. *State v. Ilk*, 2018 MT 186, ¶ 29, 392 Mont. 201, 422 P.3d 1219. "Within the meaning of *Brady*, material evidence is that evidence which, had it been disclosed, the result of the proceeding would have been different." *State v. Reinert*, 2018 MT 111, ¶ 16, 391 Mont. 263, 419 P.3d 662 (citation omitted). Thus, to establish a *Brady* violation, the defendant must show: (1) the State possessed evidence, including impeachment evidence, favorable to the defense; (2) the prosecution suppressed the favorable evidence; and (3) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different. *Reinert*, ¶ 17 (citing *Jackson*, ¶ 53).

***The x-rays***

¶27 The District Court determined the State was entitled to summary judgment on the *Brady* claim related to the x-rays because it found they were not in the prosecutor's possession and, even if they were considered to be, the prosecutor did not fail to disclose them.

¶28 Under the first *Brady* prong, the defendant must prove that the State possessed evidence, including impeachment evidence, favorable to the defense. *Reinert*, ¶ 17. The State notes *State v. Hudon*, 2019 MT 31, 394 Mont. 226, 434 P.3d 273, where the Defendant argued his blood test results were erroneously admitted at his DUI trial because the Crime Lab possessed additional information that had not been produced, in violation of the discovery statute and due process. The defense had been advised by the prosecutor of the process available to both parties to obtain the information, some of which required a court order, but had not requested it. *Hudon*, ¶ 6. We concluded the evidence was in the

13

possession and control of the State Crime Lab, and not the prosecutor, because "the Crime Lab is under control of a different government agency, separate from the county attorney's office, and is not located at or within a county attorney's office. The Crime Lab is not supervised by the county attorney's office, does not report to or take direction from the county attorney's office, is not funded by the county attorney's office, and is not administratively connected to any county attorney's office." *Hudon*, ¶ 19. We therefore concluded the Defendant's right to due process had not been violated where the defense had been advised of the procedure to obtain the evidence, but had failed to avail himself of it. *Hudon*, ¶ 21. Here, the parties do not dispute that the x-rays were in the possession of the Crime Lab, and not the prosecutor. Unlike *Hudon*, Garding had obtained a court order for production by the Crime Lab of "all notes, information, testing, recordings or materials with regards" to Parsons' injuries, and thus, she argues this was a Brady violation similar to that in *State v. Weisbarth*, 2016 MT 214, 384 Mont. 424, 378 P.3d 1195.

¶29 In *Weisbarth*, the defendant was charged with incest against his minor child. The defense called an expert witness child psychologist to testify about the victim's reactive attachment disorder, a disorder that often manifests in lying behaviors. The district court ordered the prosecutor to produce the child's medical records for the defense expert to review. *Weisbarth*, ¶ 4. The prosecutor reviewed the records and unilaterally determined that disclosing them completely would implicate the child's privacy rights, and therefore, produced a version of the records so heavily redacted that only a single sentence was left unredacted in the entire report written by the child's psychologist. *Weisbarth*, ¶¶ 5-6. After trial, the defense obtained the unredacted records, which revealed additional facts unrelated

14

to reactive attachment disorder, but discussing the child's propensity for lying. *Weisbarth*, ¶ 10. On appeal, the Defendant argued the State violated *Brady* by failing to disclose the entirety of the medical records. *Weisbarth*, ¶¶ 17-19. We agreed, and held "the State should have disclosed the substance of the records to [the Defendant]." *Weisbarth*, ¶ 25.

¶30 This case is different than *Weisbarth*, where evidence in the possession of the prosecutor was clearly withheld from the Defendant. Here, it is clear that evidence in possession of the Crime Lab about Parsons' medical condition was, unlike *Weisbarth*, disclosed to both parties, and both parties were explicitly aware of the x-rays. Both Dr. Dale and Dr. Bennett referenced them in their respective reports prior to trial, including Dr. Bennett's reference that "postmortem radiograph revealed a slightly displaced left fibular fracture 11 inches above the heel." Garding argues that, had the "substance" of the x-rays—copies or originals—been disclosed, she could have impeached the credibility of Dr. Dale by pointing out that the bumper on Garding's vehicle should have caused more damage to Parsons' legs than only a fibula fracture if he had been thrown as far as Dr. Dale had postulated. However, Garding's counsel questioned several witnesses about Parsons' injuries, including the fibula fracture, in support of her central contention that Garding's vehicle had not inflicted the injuries. It cannot be doubted that, had there been additional injuries to Parsons, they would also have been noted in the experts' reports from the x-rays and records, including the experts' respective conclusions about whether Garding's vehicle had caused them.

¶31 Garding is correct that this Court removed an additional requirement—reasonable diligence—from our *Brady* analysis, premised on the Ninth Circuit Court's holding in

*Amando v. Gonzalez*, 758 F.3d 1119 (9th Cir. 2014); *see Reinert*, ¶ 17, n.1. This eliminates from the analysis an obligation upon a defendant to have reasonably sought out the evidence. However, and nonetheless, the *Amando* court noted that "defense counsel cannot ignore that which is given to him or of which he is otherwise aware." *Amando*, 758 F.3d at 1137 (citations omitted). Here, Garding was not only aware of the evidence because of its disclosure, she had actively used it. Her expert referenced it and she examined witnesses based on it. We cannot conclude that the prosecution in any way suppressed the evidence. Consequently, the District Court did not err by denying this *Brady* claim.

### *The 2005 photos*

¶32     Three days after his testimony and cross examination in this case, Dr. Dale located photographs of a victim and vehicle involved in a different vehicle-pedestrian accident in 2005. He had not used the photographs in forming his opinions in the Garding case, nor did they change his opinions in any way, but he believed they would be supportive of his opinions in the event he was called as a rebuttal witness in the trial. Dr. Dale placed the photographs in his file at that time, and did not notify the prosecutor about them. Dr. Dale was not called as a rebuttal witness.

¶33     The District Court concluded Garding's *Brady* claim based on the 2005 photographs failed because, "the photos [were] not material. They [were] not evidence in this particular case. When looking at the record as a whole, they provide[d] insufficient information needed for accurate comparison of the 2005 crash and the crash at issue here." The District Court concluded the photographs were not exculpatory and not material because they did

not create a reasonable probability that the outcome of the proceeding would have been different.

¶34 Garding asserts the photos are material because they would have allowed the defense to question Dr. Dale's conclusion that Parsons' injuries primarily stemmed from hitting the road. Garding had offered a theory that the vehicle that struck Parsons would have sustained damage to its hood and windshield.[3]

¶35 First, it cannot be said that the prosecution suppressed evidence about which it was unaware—evidence that an expert had independently obtained for possible use in future testimony and placed within his own file. Then, given the timeline of the appearance of the photographs, it is unlikely Garding could have used the photos to directly impeach Dr. Dale at all, as he was not thereafter recalled by the State to the trial. Assuming that opportunity would have occurred, then, as the District Court noted, the many distinctives between the photographs and this case may have subjected the photographs to a relevancy objection. Assuming their admission, we cannot conclude that the photographs would have been material to the outcome, as the theory espoused by Garding was already thoroughly presented, including by examination and criticism of Dr. Dale's opinions about the impact. Dr. Dale had already admitted that another car could have caused Parsons' injuries, and the photographs do not establish that Garding was not involved in the accident. Dr. Dale believed they supported, not undermined, his opinions regarding the impact in this case.

---

[3] Glass pieces found upon Parsons' body were tested by Garding, but the tests indicated the pieces were not windshield glass.

17

¶36    We conclude the photographs were not suppressed, material nor exculpatory, and that the District Court did not err by concluding the State did not violate Garding's due process rights by failing to disclose the 2005 photographs.

¶37    *3. Did the District Court err by concluding Garding failed to present newly discovered evidence?*

¶38    In its summary judgment order, the District Court concurred with the State's argument that the "new," or post-trial, accident reconstruction analysis offered by Garding in support of her petition did not qualify as "newly discovered" evidence, because it was based upon evidence available and known to the defense at the time of trial, and only the additional analysis of that evidence was new.[4] Garding argues that the District Court erred as a matter of law in so ruling because the "newly discovered" requirement under § 46-21-102, MCA, applies only to petitions filed *beyond* the general time limit of one year after the conviction becomes final, for purposes of establishing the exception to the time bar. Because her petition was timely filed, Garding contends the District Court erred in applying any "newly discovered" requirement whatsoever.

¶39    As the State notes, Garding's argument somewhat conflates the standards governing PCR petitions. Garding is correct that an *untimely* filed PCR petition must satisfy the exception to the general one-year time bar by demonstrating the existence of newly discovered evidence that the petitioner did not engage in the criminal conduct, which

---

[4] The District Court did not exclude the accident reconstruction evidence from the proceeding for purposes of Garding's IAC claim.

18

extends the time for filing a petition to within one year of discovery of the evidence.[5] *See Guillen v. State*, 2018 MT 71, ¶ 12, 391 Mont. 131, 415 P.3d 1. However, she is incorrect in arguing that a *timely* filed petition is not subject to any assessment of the evidence alleged to be newly discovered. As we explained in *Marble v. State*, 2015 MT 242, 380 Mont. 366, 355 P.3d 742, a timely filed PCR petition based upon newly discovered evidence must nonetheless undergo examination by the court to determine if the evidence is actually "newly discovered." *Marble*, ¶¶ 34, 36. While not subject to the more rigorous actual innocence thresholds applied to untimely petitions, district courts may examine timely filed petitions alleging newly discovered evidence with a broad array of tools. As we explained in *Marble* regarding timely filed petitions based upon new evidence:

> In making this determination, a district court may seek guidance from our case law addressing various forms of newly discovered evidence, such as our precedent with respect to recantations, whether set forth in a case involving a motion for new trial or one addressing a PCR petition. . . . [T]he first four factors of the *Clark* test also remain a viable resource *when determining whether the newly discovered evidence should be considered*.

*Marble*, ¶ 36 (emphasis added) (citations omitted).

---

[5] Section 46-21-102, MCA, provides, in pertinent part:

> (1) Except as provided in subsection (2), a petition for the relief referred to in 46-21-101 may be filed at any time within 1 year of the date that the conviction becomes final.
>
> . . . .
>
> (2) A claim that alleges the existence of newly discovered evidence that, if proved and viewed in light of the evidence as a whole would establish that the petitioner did not engage in the criminal conduct for which the petitioner was convicted, may be raised in a petition filed within 1 year of the date on which the conviction becomes final or the date on which the petitioner discovers, or reasonably should have discovered, the existence of the evidence, whichever is later.

¶40 Here, the District Court did not hold that Garding had failed to satisfy the exception to the time bar—that would have been the incorrect issue. Rather, the District Court held that the expert analysis of the accident submitted in support of Garding's timely filed petition was simply not newly discovered evidence, the same kind of determination we made in *Kenfield v. State*, 2016 MT 197, ¶ 15, 384 Mont. 322, 377 P.3d 1207, where we concluded that an expert report obtained by the defendant after trial regarding bullet trajectory analysis could not be considered new evidence because "the new report [was] simply an additional analysis of the same evidence used at trial[.]" As explained in *Marble*, quoted above, the first four factors of the *Clark* test, *see State v. Clark*, 2005 MT 330, ¶ 34, 330 Mont. 8, 125 P.3d 1099, remain a viable resource for a district court's assessment of the evidence. The first factor of the *Clark* test is that "the evidence must have been discovered since the defendant's trial." *Clark*, ¶ 34. Similar to our conclusion about the new evidence in *Kenfield*, the District Court here reasoned as follows:

> [T]he Court finds that there is no genuine issue of material fact that the purported new evidence . . . used by the Petitioner's experts was available at the time of the trial. During summary judgment hearing, the Court noted that the computer simulation evidence includes a mathematical formula that has been used by accident reconstructionist[s] for decades and was well-known technology in existence at the time of trial. Petitioner has not established that there was no way of conducting any of the new analysis in 2011, nor has she shown that the new evidence could not be obtained in 2011.

¶41 The analysis employed by the District Court distinguishes this case from *United States v. De Watson*, 792 F.3d 1174 (9th Cir. 2015), upon which Garding relies. In *De Watson*, the DNA testing at issue was unavailable at the time of the defendant's trial, and thus could be considered "newly discovered." *De Watson*, 794 F.3d at 1183.

20

¶42 The new expert analysis at issue here is governed by our decision in *Kenfield*. A decision to consider the analysis to be "newly discovered evidence" would significantly undermine the finality of convictions, as subsequent and perhaps seriatim scientific analyses of the same evidence could be employed to obtain new trials. We conclude the District Court did not err by dismissing Garding's newly discovered evidence claim.

¶43 Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR

Justice Ingrid Gustafson, dissenting.

¶44 The State Crime Lab failed to provide Garding with documentation—including x-rays of the victim's legs—that the trial court ordered the lab to produce. Garding's trial expert has attested in the postconviction relief proceedings that the suppressed x-rays would have changed his written report, and her trial counsel attested the change in report would have changed the emphasis of the case. Further, the State failed to turn over photos from a prior fatal vehicle-pedestrian collision included in the Crime Lab file for this case that could have been used to challenge the opinion from the State's medical expert. In an effort to show that the evidence was not exculpatory, the State presents a theory of the case in these postconviction relief proceedings that it did not present to the jury—a low-speed,

21

side-only-impact collision. Given these facts, I would hold that the state violated Garding's due process rights under *Brady* and she is entitled to a new trial.

¶45 Second, although I agree with the District Court determination that the expert accident reconstruction reports presented with Garding's petition for postconviction relief are not newly discovered evidence because Garding could have sought those reports at the time of her trial, her trial counsel provided her ineffective assistance of counsel under the circumstances of this case in failing to seek those reports before trial to bolster Garding's trial defense. The accident reconstruction reports Garding presented with her petition for postconviction relief demonstrate that the theory of impact the State presented at trial violated the laws of physics. In response, the State produced an expert witness during these proceedings, who did not disagree with those experts, but rather propounded an alternative theory of the accident—a low-speed-impact theory the State did not present to the jury at trial. Importantly, unlike the theory the State presented at trial, the low-speed-impact theory contradicts testimony from key State witnesses. Garding's trial counsel provided ineffective assistance of counsel for failing to seek expert opinion to explain that the theories of the crash the State presented at trial could not possibly have occurred, especially in light of the fact that trial counsel attested that the decision was not strategic, Garding maintained her innocence, and the State's case lacked physical evidence connecting Garding to the crime, but rather relied heavily on testimony from Garding's ex-boyfriend— who was facing unrelated criminal charges and provided inconsistent accounts of the night—to connect Garding to the collision. I would reverse the District Court and remand

22

with instructions to grant Garding's petition for a new trial. I dissent from today's decision failing to do so.

***Brady* Claims**

¶46 Garding raises two *Brady* claims on appeal. First, the State suppressed medical information including x-rays of the victim's legs that Dr. Dale used in preparing his post-mortem report. Second, the State suppressed photographs from a prior fatal vehicle-pedestrian collision that Dr. Dale analyzed for comparison and put into the State Lab's file during trial.

¶47 Under *Brady*, a criminal defendant has a constitutional right to obtain exculpatory evidence, and the State violates the defendant's right to due process when it suppresses such evidence. *State v. Robertson*, 2019 MT 99, ¶ 32, 395 Mont. 370, 440 P.3d 17 (citing U.S. Const. amend. XIV; Mont. Const. art. II, § 17). To prove the State violated her due process rights under *Brady*, a defendant must establish that: (1) the State possessed evidence favorable to the defense; (2) the prosecution suppressed the favorable evidence; and (3) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different. *Robertson*, ¶ 32 (citing *Ilk*, ¶ 29). The defendant bears the burden of proving all three prongs to demonstrate a *Brady* violation occurred. *Robertson*, ¶ 32. A *Brady* analysis is not a sufficiency of the evidence test. *Kyles v. Whitley*, 514 U.S. 419, 434-35, 115 S. Ct. 1555, 1566 (1995). A petitioner demonstrates a *Brady* violation "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S. Ct. at 1566. The "tendency and force" of the

23

individual items of undisclosed evidence are evaluated separately, but the court must consider their cumulative effect when determining prejudice. *See Kyles*, 514 U.S. at 436 n.10, 115 S. Ct. at 1567 n.10.

¶48 The District Court dismissed Garding's first *Brady* claim on summary judgment. The court concluded that Dr. Dale's post-mortem report and testimony during the pre-trial probable cause hearing put Garding on notice the Crime Lab had x-rays of the victim's legs and Garding had a duty to obtain evidence in her defense.

¶49 The District Court's determination overlooks the important fact that Garding's trial counsel did move for an order from the court, directing the State Crime Lab "to produce all notes, information, testing, recording or materials with regards to" the autopsy of Parsons. The State opposed the motion, arguing that such release was against the policy of the Crime Lab and that "it is the duty of the prosecutor to make available for examination and reproduction all written reports or statements of experts. The duty does not extend to their notes, testing, recordings, or other materials."[1] The District Court granted Garding's motion and ordered the Crime Lab to "provide a copy of all their notes, testing, information, recordings or materials" from their case file for Parsons. It is clear from its opposition to Garding's discovery motion the prosecution considered Dr. Dale to be their expert medical witness early in the investigation and recognized their duty to ensure discoverable material was released to the defense. And indeed Dr. Dale testified as the State's medical expert at

---

[1] Garding responded to the State's objection, arguing this was an inaccurate representation of the Crime Lab policy and further that the Crime Lab is a neutral state agency and the county attorney's office had no standing to object to or interfere with the discovery of materials from the Crime Lab.

trial. The Crime Lab did not act as a neutral state agency in this case but was working on the State's behalf.

¶50 The Crime Lab possessed evidence that was favorable to Garding's defense—x-rays that showed a relatively minor fracture to the victim's legs—that it failed to provide to the defense after the District Court ordered it to "provide a copy of all of their notes, testing, information, recordings or materials" from their case file for Parsons. Unlike the defendant in *Hudon*, Garding followed the accepted procedure for obtaining evidence from the Crime Lab by moving for and receiving a court order for the release of the information. Garding was not required to "scavenge for hints of undisclosed *Brady* material." *Banks v. Dretke*, 540 U.S. 668, 695, 124 S. Ct. 1256, 1274-75 (2004). Rather the "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles*, 514 U.S at 437, 115 S. Ct. at 1567. This requirement means that a prosecutor has to put in place "procedures and regulations . . . to insure communication of all relevant information on each case to every lawyer who deals with it." *Kyles*, 514 U.S. at 438, 115 S. Ct. at 1568 (internal quotation omitted). The State is responsible for ensuring that the Crime Lab has procedures and regulations in place to ensure all relevant information is released to the defense—especially when the Crime Lab is serving as the State's expert in the case and after the court has explicitly ordered it to do so. The State was obligated to release the x-rays to Garding and did not do so.

¶51 Had this evidence been disclosed, Garding's medical expert attested that his report would have been different and trial counsel attested she would have focused on the medical

25

aspects of the case more.[2]  In response, the State has changed its theory of the collision in these postconviction proceedings.  The State argued at trial that the lack of damage to Garding's vehicle and Parson's relatively minor leg injuries were because Garding's "vehicle was correcting."  Officers testified that Garding was either swerving or she only "clipped" Parsons.  Barry, who was walking beside Parsons when Parsons was struck testified, "I didn't think someone could survive that just because it was – it was just too fast" and "the vehicle was coming extremely fast."  Baylor, who was driving on the roadway and witnessed the collision testified that the vehicle was "going regular speed up until the point that they hit that person" in a thirty-five mile per hour zone.  At trial, the State did not argue that the vehicle that struck Parsons was moving at a low speed in contravention of these eye-witness accounts.  Now, however, the State argues that the impact occurred at a low speed and was side impact only.  This change in theory in response to Garding's postconviction relief petition is strong evidence that had Garding had the x-rays, she could have successfully challenged the State's theory at trial and forced them to put on a different case than they did.

¶52    A similar conclusion must be drawn from the suppressed photographs from the 2005 fatal collision.  The District Court dismissed Garding's second *Brady* claim after an

---

[2] The Opinion maintains that Garding was not only aware of the evidence, but her medical expert relied on Dr. Dale's assessment of the x-rays and she actively used Dr. Dale's assessment of the x-rays in cross-examining witnesses. Opinion, ¶¶ 30-31. This misses the point: Dr. Bennett relied on Dr. Dale's and the police report's description of the x-rays, rather than then assessing and interpreting the x-rays for himself when writing his expert report for trial. Dr. Bennett's affidavit makes clear that had he analyzed the x-rays himself in preparing his expert report for trial, he would have found the x-rays more significant than he did based on the mere descriptions of the x-rays provided to him in preparing his report for trial.

evidentiary hearing. The court determined that Garding did not show a reasonable probability of a different outcome if the photographs had been disclosed because there was not enough information for an accurate comparison of the collisions in the two different cases. The court concluded Garding was not prejudiced because she was still able to present the theory at trial that there should have been damage to the vehicle that struck Parsons.

¶53 The State does not dispute that Dr. Dale put the photographs in the file during trial. "[T]he government's duty to provide *Brady* material is ongoing" through trial and the photographs should have been turned over to the defense. *Ilk*, ¶ 34 (internal quotations omitted). The State instead argues the District Court correctly determined there was no reasonable probability the outcome would have been different, citing the other evidence the State presented at trial. But a *Brady* analysis is not a sufficiency of the evidence test. *Kyles*, 514 U.S. at 434-35, 115 S. Ct. at 1566. Rather, a *Brady* violation occurs if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S. Ct. at 1566. Dr. Dale admitted at the evidentiary hearing that the injuries on the two victims were similar. Thus, the photographs supported Garding's theory of the collision that damage would be expected on the vehicle involved, even with relatively minor leg injuries. Although, Dr. Dale testified the photographs did not change his conclusion that Parsons' head injuries were caused by contact with pavement and not a windshield, the photographs would have given credence to the defense's theory that the type of injuries found on Parson were also consistent with striking a windshield and greater vehicle damage.

27

¶54   Taken together, I would conclude the suppression of the x-rays and photographs undermine confidence in the verdict.  The x-rays support a theory that the leg injuries to Parsons would have been more catastrophic had her vehicle with its square steel bumper hit the victim.  The photographs support Garding's theory of the case presented at trial that even with the relatively minor leg injuries observed, the vehicle that struck Parsons would have sustained damage.   While the State's new theory of a fatal, low-speed, side-only-impact crash may prove convincing to a jury, a jury—not this or any other court—must still decide that in the first instance.  The very fact the State changed its theory during postconviction relief proceedings proves the suppressed evidence puts "the whole case in such a different light as to undermine confidence in the verdict."  *Kyles*, 514 U.S. at 435, 115 S. Ct. at 1566.

**Ineffective assistance of counsel**

¶55   In assessing ineffective assistance of counsel claims, this Court adopted the two-pronged test set forth in *Strickland*.  *State v. Santoro*, 2019 MT 192, ¶ 15, 397 Mont. 19, 446 P.3d 1141.  The defendant must (1) demonstrate that "counsel's performance fell below an objective standard of reasonableness" and (2) "establish prejudice by demonstrating that there was a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different."  *Santoro*, ¶ 15 (quoting *State v. Kougl*, 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095).  Courts determine deficient performance under the first prong based on "whether counsel's conduct fell below an objective standard of reasonableness measured under prevailing professional norms and in light of the surrounding circumstances."  *Whitlow*, ¶ 20.  "[W]hether counsel's conduct flowed from

28

ignorance or neglect . . . is certainly a relevant consideration in the analysis." *Whitlow*, ¶ 20. "[E]ven if an omission is inadvertent, [however,] relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Whitlow*, ¶ 32 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S. Ct. 1, 6 (2003). Rather, this Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Whitlow*, ¶ 21 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065); *see also Santoro*, ¶ 15.

¶56   The District Court held trial counsel's performance was not deficient, because Garding failed to overcome the presumption the decision not to utilize an expert may be considered sound trial strategy. The District Court held, further, that Garding did not suffer any prejudice by the failure to utilize an expert because there is no reasonable probability the result of the proceeding would have been different. Garding and the State both called experts on accident reconstruction at the evidentiary hearing. The court found the State's expert was more credible, explaining Garding's experts did not account for the relatively minor leg injuries to Parsons or the eye-witness testimony at trial.

¶57   The evidence from Garding's experts on postconviction relief is emphatic and persuasive: Harry W. Townes wrote a report considering the State's theory of the accident at the time of trial in comparison to a crash test with the same vehicle. Townes opined that there would be damage to a vehicle traveling more than thirty-five miles per hours that hit a pedestrian. He explained that swerving would not eliminate vehicle damage, as the officers theorized at Garding's trial. Keith Friedman of Friedman Research Corporation conducted systems analysis of the collision. In his report, Friedman reviewed the scientific

literature about pedestrian-vehicle collisions and explained: "General characteristics in virtually all crashes shown indicated clear vehicle damage when an adult serious or fatal pedestrian impact occurred. . . . The literature reviewed indicates that fatal adult pedestrian impacts are likely to show significant damage to the hood, windshield and/or roof structure." After reviewing the literature and conducting a systems analysis Friedman concluded: "Within a reasonable degree of engineering certainty, Ms. Garding's vehicle was not the vehicle that impacted Mr. Parsons. The damage present on Ms. Garding's vehicle is in no way consistent with a pedestrian impact sufficient to kill a walking adult person." Friedman explained the testimony of the officers at trial regarding pedestrian kinematics is incorrect and violates the laws of physics.

¶58 In response to this evidence, the State has abandoned the theory of the collision it relied on at trial. The United States Supreme Court explained in *Harrington*, 562 U.S. at 106, 131 S. Ct. at 788: "Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both." This is one of those cases. I would find Garding's counsel's performance fell below an objective standard of reasonableness, considering the surrounding circumstances. First, the key State witness to connect Garding to the crime was her ex-boyfriend, who repeatedly changed his story and had reason to curry favor with the State because he was facing unrelated criminal charges and potential persistent felony offender status. Second, Garding has steadily maintained she had nothing to do with the tragic death of Parsons and her vehicle was not in the area when the collision occurred. Third, Garding's vehicle lacked damage that even the officers initially investigating the

case expected to see. Fourth, to explain the lack of damage to the vehicle, the State relied on the opinions of two officers—neither of whom created an accident reconstruction of the incident or had any expertise in physics—to opine on the possible mechanics of the impact. Those officers opined the lack of damage was due to the vehicle swerving or because it merely "clipped" Parsons on one leg, in spite of muscle tearing to both legs.[3] Finally, Garding's trial counsel attested she did not make a strategic decision to forgo an accident reconstructionist, but rather was ineffective when she failed to hire one.

¶59 The District Court found trial counsel's "self-serving statements" about being overwhelmed not credible and she "made a calculated decision" to not hire an accident reconstructionist. Even if these findings are not in error, I would still find trial counsel's performance deficient.[4] In this case, it was constitutionally deficient to allow the State to

---

[3] The reports from Garding's experts on postconviction relief prove these scenarios are physically impossible. In fact, the State has changed its theory of the accident on postconviction relief. The State no longer relies on the theories propounded by the two officers at trial but relies on a new analysis of the accident completed by Trooper Philip Smart. Although the court found Trooper Smart to be more credible than Garding's experts, Trooper Smart's theory of a low-speed impact was not put before the jury at trial.

[4] I believe the District Court clearly erred in finding trial counsel made a calculated decision. The District Court emphasized that trial counsel discussed the case with three investigators, Dr. Bennett, and other attorneys in her office, and "[n]o one felt that an accident reconstruction was appropriate in the case." This finding is in clear error. Steven Scott, who was assigned as co-counsel in the case for a limited time, admitted that trial counsel did not discuss the case with him. Meetings with other attorneys in the office, as described by trial counsel, did not involve in-depth discussion of cases. It was not Dr. Bennett's role to suggest hiring an accident reconstructionist. And three investigators staffed the case, not because of thorough staffing, but because of chronic, high turn-over. None of the investigators staffed the case simultaneously. The court found further that trial counsel had worked with an accident reconstructionist in a prior case and was aware of the valuable insight an accident reconstructionist could provide. This highlights trial counsel's oversight in this case. She knew the value but did not consider hiring an accident reconstructionist under circumstances that demanded it. The court found that it was "sound trial strategy" to rely on cross-examination and trial counsel "effectively cross-examined the State's witnesses on matters that called into question the vehicle involved in the crash." But this effective

put on non-expert opinions about the mechanics of the impact without any counter. The officer's testimony likely carried much weight with the jury and trial counsel failed to provide expert evidence to support an alternative scenario or to explain that the State's theory violated the laws of physics and was not physically possible.

¶60 Further, Garding was prejudiced by trial counsel's failure. The State has changed its theory of impact during these postconviction proceedings. At trial, the State argued there was a lack of damage to Garding's vehicle because she was "correcting" back onto the road. Now the State argues the lack of damage is due to the low speed that her vehicle was travelling. In contrast to the District Court's findings that Trooper Smart's conclusion accounts for the eye-witness testimony at trial, Trooper Smart's conclusion this was a low-speed collision does not conform to the eye-witness trial testimony. As explained above, none of the eye witnesses testified to a low-speed impact, but rather testified the vehicle was moving "too fast," "extremely fast," "regular speed," and Parsons went "flying through the air" upon impact. The State's change in theory is sufficient to demonstrate that had trial counsel not failed to engage an accident reconstructionist, there is a reasonable probability the outcome of the trial would have been different.

¶61 I would reverse and grant Garding's petition for a new trial.

---

cross-examination did not and could not counter officer testimony about the mechanics of the collision. Expert testimony to explain why the scenario's offered by the officers violated the laws of physics and could not have occurred was required. Relying on cross-examination alone was unreasonable because it allowed the jury to rely on a scenario that could not have physically happened and defied science.

/S/ INGRID GUSTAFSON


Justice Laurie McKinnon joins in the dissenting Opinion of Justice Gustafson.


/S/ LAURIE McKINNON